## MORRISON et al. v. MARQUARDT et al.*

<div style="float:right">

24   35
118  296

24   35
f141  191

</div>

1. **Dedication:** BY PAROL. There may be a dedication of land to public use without deed or other written evidence. But in such cases the intent to dedicate should be clear, and the acts or circumstances relied on to establish such intention unequivocal and convincing.

2. **Easement:** RIGHT TO LIGHT AND AIR. *It seems*, though not expressly decided, that the English doctrine that if a man sells a house with windows and doors looking upon his own vacant ground, he or his grantee, cannot afterward build upon such vacant ground in such a manner as to seriously obstruct the flow of light and air to such house, is not applicable to our situation and circumstances, and not in force here.

3. —— BY IMPLICATION. The doctrine of implied easements rests upon the supposed intention of the parties as deduced from the circumstances, situation and condition of the two estates, servient and dominant.

4. —— MUST BE CLEARLY GIVEN. An easement of the character above referred to, preventing the owner of land from improving it as he pleases, should not be implied where it is not clearly given. The circumstances which were held in the present case to negative the implication of such an easement, enumerated by DILLON, Ch. J.

5. **Nuisance:** ABATEMENT. A party may with his own hand abate that which is to him a nuisance. But such abatement does not consist in the destruction of the property, unless such destruction be absolutely necessary.

6. —— RESTORATION : EASEMENTS. Where a building is illegally destroyed, under the pretense that it is a nuisance, the parties having easements therein do not lose them, and are not remitted to their action for damages, but may enforce the restoration of the building.

*Appeal from Johnson District Court.*

TUESDAY, JANUARY 28.

DEDICATION : IMPLIED EASEMENTS : LIGHT AND AIR BY IMPLICATION : DESTRUCTION OF EASEMENTS, ETC. — The following plat will materially assist in understanding the facts involved in the controversy between the parties :

---

* A number of cases, including the present one, were argued before, but not submitted until after, the accession of Hon. J. M. BECK to the Supreme bench. Hence, in their decision he took no part. These cases will be found designated by a * affixed to the title thereof.

Morrison v. Marquardt.

James Robinson originally owned in fee the lot in Iowa city, fronting on Clinton street 150 feet, and on Washington street, 100 feet. On the south was a public alley running through the block. Shephard & Hess owned on the east of Robinson. The numbers from 1 to 8, inclusive, indicate the number of stores and business houses built upon said ground. Robinson himself erected on this ground, stores No. 1, 2, 4, 5 and 8. One Wheeler, under a lease hereinafter referred to, built two stores (No. 3 on the plat). Cook, Sargent & Downey built No. 6, marked " Bank " on the plat. Startsman (one of the plaintiffs) erected a new store or building (No. 8), on a site occupied by a frame building at the time he purchased from Robinson. Startsman (plaintiff) still owns No. 8, upon which is a store the whole size of the lot, viz.: 20 feet wide and 50 feet deep. Morrison and his children (also plaintiffs) own No. 7, a store 17½ feet wide by 50 feet deep; Startsman and Morrison's stores run south to a passage or right of way 4 feet wide. This store No. 7, was built by Robinson and sold by him to the wife, since deceased, of the plaintiff Morrison. Store No. 5 was built by Robinson, and by him sold to Hamilton, and by the latter since sold to, and now owned by, the defendant Marquardt. In this building there was a door ( " D " on plat) opening into the 4 feet right of way. Defendant Marquardt purchased store No. 4 of Robinson, also 11 feet on the rear thereof, being 20 feet by 66 feet. This purchase was made August 11, 1863. The store thus purchased was 20 feet wide and 55 feet deep.

Robinson's disposition of the various stores was as follows: In 1856, he sold the ground of No. 6 to Cook, Sargent & Downey, and that firm, in that year, or the next, erected a bank building thereon 30 by 60 feet in size. August 3, 1858, Robinson leased to Wheeler No. 3, being 40 feet on Clinton street, and 90 feet deep, for

99 years.   Prior to this time, Robinson had built stores
1, 2 and 4.   Wheeler, in the lease, " agreed to erect upon
said ground leased to him a three story building to cor-
respond to a plan made by said Wheeler, of which plan
the building known as the jewelry store of G. W. Mar-
quardt (*i. e.* No. 4 on the plat) forms a part."   This
lease was acknowledged and recorded.   Wheeler erected
thereon two brick stores, each 20 by 50 feet, the east end
being of wood, so as the more readily to admit of being
enlarged by being extended east.   No. 1 was built by
said Robinson in a similar manner, and with the same
view.   Robinson still owns No. 1, and the barn in the
rear thereof.

June 1, 1863, Robinson sold store 5 (20 by 60 feet in
size) to one Hamilton, " granting also right of way four (4)
feet in width, extending from the southeast corner of said
premises east, across ground of the said Robinson, to a
10 feet alley running south to an established alley ;
granting also the right to the use of the privy now stand-
ing on ground of the said Robinson almost due east from
the S. E. corner of said premises, also gas fixtures and
awning frame."   This deed was recorded the same day
(Sept. 18, 1866) defendant Marquardt purchased No. 5 of
Hamilton.

June 3, 1863, two days after Hamilton's said pur-
chase, the plaintiff Startsman purchased of Robinson
20 by 50 feet (No. 8), on which there was then an old
frame building.   The deed from Robinson to Startsman,
after the *description* of the property conveyed, contained
the following :   " Granting hereby also the right of way, 4
feet in width along the south end, and 2 feet 6 inches in
width along the east side of said premises ; granting also a
*right to the use of the privy*, in the rear of said premises ;
also hereby granting to said Startsman the right to extend
the *second* story of any building he may erect on said

premises over the 2 feet 6 inches alley or right of way on the east side thereof." Startsman soon after erected the brick store now owned by him, making the same 20 by 50 feet, but not availing himself of the right to extend his second story 2 feet 6 inches east over the $2\frac{1}{2}$ feet right of way. Subsequently, viz., in 1865, Shepard & Hess, who owned land which adjoined Startsman on the east, wished to build; Startsman did not want the $2\frac{1}{2}$ feet passage left, but did want S. & H. to build clear up to him and pay him for one-half of the wall they used. To this S. & H. consented. To effect this arrangement, Startsman conveyed (Sept. 2, 1865), to Robinson, all his right to the 2 feet 6 inches strip, and the same day Robinson conveyed this strip by warranty to Shepard & Hess. The latter built so as to close up this passage or right of way. This was done by the consent of Startsman, and the latter received compensation for half of his wall used by Sheperd & Hess.

August 11, 1863 (*i. e.* after Startsman's purchase of No. 8, and before Morrison's purchase), Robinson sold and conveyed for $3,500 to the defendant Marquardt, store No. 4 on the plat; the store being 20 by 55 feet, *and also* the unoccupied 11 feet east of the store, the ground being 20 by 66 feet in all.

After the *description* of the property the deed continues thus: " With the privilege of right of way four (4) feet in width running from the N. E. corner of the building on said premises east, to an alley 10 feet wide, running south to city alley: *granting also the right to use a privy due east of said premises*, also the right of stairway secured to Robinson by the Wheeler lease recorded in book 16, p. 377."

At the time of this sale of No. 4 to Marquardt, the said Robinson still owned store No. 7, soon afterward sold by him to Morrison. The eleven feet east of the store

on No. 4 was vacant, but as before stated was included in Robinson's deed to Marquardt, of August 11, 1863. *This eleven feet extended east to a point beyond the window in the rear of store No. 7.*

September 15, 1863, Morrison purchased of Robinson for $3,500, store No. 7, being 17½ by 50 feet. The deed contained the following special provisions: All right to roof under Robinson's contract with Downey: " *Granting also hereby the right of way four* (4) *feet in width along the south end of said premises; also the right to use a privy in the rear of said premises.*"

February 20, 1866, Robinson sold store No. 2, and 20 feet in the rear thereof, to Riggs.

June 12, 1866, Robinson, in consideration of $300, conveyed to the defendant Marquardt, the ground on the east of No. 4, and the 10 feet east of the property leased to Wheeler. The property thus sold is indicated on the plat by the words, " *Ground sold by Robinson to Marquardt.*" The deed contains this clause: "saving and excepting *the right of way to a strip four* (4) *feet wide off the north side of said premises,* heretofore granted to the owners of land immediately north of the above named premises, *and the privileges granted said parties by the said Robinson.*"

After his last purchase, claiming that the privy vault thereon situate was full, and a nuisance, *Marquardt removed the privy; and commenced preparations to extend store No. 4 eastward, clear across the open ground, and over the site of the privy, up to the walls of the store of Shepard & Hess.* Whereupon plaintiffs, Morrison and Startsman, as the owners of Nos 7 and 8 bring this suit in equity. They claim first, that Robinson *dedicated* the ground east of the stores fronting on Clinton street, and south of the plaintiff's stores as a court, area, or space, to be permanently left and kept open for the use and convenience of

asid stores; second, that when Robinson sold them the said property, they became entitled to an easement of light and air, and that this easement will be destroyed by the erection of the proposed addition to his building by the defendant Marquardt; third, that they had an easement in the privy, and that Marquardt had no right to remove or destroy the building. The petition makes Robinson and Marquardt defendants. The prayer thereof is as follows : " That a temporary injunction be granted enjoining defendants from building on the open area aforesaid, or any part thereof; that the same, on final hearing, be made perpetual; that plaintiffs be entitled to have erected and maintained at the expense and costs of said Robinson, said privy so removed as aforesaid, and for their costs and general relief."

The answer denies any dedication of the open area. Admits the removal of the privy, and claims that it was a nuisance, and the vault full. Also, admits that Marquardt does propose to extend his store two or three stories in height east, but not so as to interfere with the 4 feet right of way south of plaintiff's premises. Denies that the proposed erection would substantially interfere with the comfortable or reasonable enjoyment of the plaintiff's stores as respects air and light. The cause was referred to Hon. RUSH CLARK as a referee, whose report is set out in the margin.*

---

* REPORT OF REFEREE.—1. No importance is attached to the alleged representations of James Robinson, the common grantor, which the complainants aver were made to them previous to and at the time of the conveyances to them, since, in the judgment of the referee, the deeds to the parties are conclusive in this suit as to any intention Robinson may have had, or represented to exist, regarding the disposition of the premises. Wash. on Easements, 44, 45; 13 Eng. Ch. 474.

2. Touching that portion of the area mentioned in the petition and running east 11 feet from the rear of Marquardt's present building, and which was parcel of his first purchase from Robinson by deed of Aug. 11, 1863, and previous to purchase of Hannah C. Morrison, I find that no reservation or restriction was made by Robinson, in conveying, as to the right of the purchaser to build thereon, and that as to

A decree was entered accordingly. Both parties appeal. Plaintiffs' claim that Marquardt should have been restrained from erecting any building whatever in the rear of their stores. On the other hand, Marquardt claims that the injunction should have been dissolved, and that he should have been allowed to build without *any restriction* as to light. The other questions made appear in the opinion.

*Fairall & Boal*, and *Edmonds & Ransom*, for the plaintiffs, in the course of a lengthy argument, made, among others, the following points:

1. Robinson, by his acts, the use to which he devoted it, and his continued assent, *dedicated* the area to a common use. *City of Cincinatti* v. *White*, 6 Pet. 431; *Hunter* v. *Trustees, etc.*, 6 Hill, 407.

A dedication may be made without writing, by act *in pais* as well as by deed.

that portion of the area in the bill mentioned, the complainants are not entitled to relief. Wash. on Easements, p. 33, and cases cited.

3. That as to the residue of the said *area* in rear of the complainant's premises, and lying north of the north line of Wheeler's premises, I find that there was not expressly reserved by Robinson in conveying to Morrison and Startsman the right of building thereon unrestrictedly. that there was impliedly granted thereby to said Morrison and Startsman the right to drive over the portion of the said area last referred to, *and which was still owned by Robinson*, and the light and air reasonably necessary to the substantial use and enjoyment of the premises purchased by complainants respectively. And I conclude upon the whole testimony that the erection upon the area, or portion of ground last referred to, of a building of two or more stories in height, would deprive the complainants to a substantial degree in the use of their premises. But on the other hand I conclude that the erection on the portion of the area mentioned last aforesaid, of a building of one story, not exceeding in height the first story of the building in front of said portion of the area, and now occupied by Marquardt, to be so built as not to encroach on the passage way of four feet, and with covering not extending higher than necessary for safety and protection of such building, would not work such substantial deprivation to the complainants. *Roswell* v. *Prior*, Holt. 500; *Palmer* v. *Fletcher*, 1 Vent. 274; *The United States* v. *Appleton*, 1 Sumn. 492; *Story* v. *Odin*, 12 Mass. 157, and other cases cited by complainants.

(*Note.* I have adopted and applied to this case the rule to be gathered from the cases cited, and have extended it as far as seems to me proper in the case in hand, "one general test is, how far the incidents claimed are necessary to the reasonable enjoyment of what is expressly granted." Wash. on Easements, p. 36.)

It is not at all necessary that the owner should part with the *title* which he has, for dedication has respect to *possession* and not the *permanent estate*. Wash. Real Prop. vol. 2, marginal page 460.

A dedication of real property is that devotion to use, which estops the owner of the fee; not a technical estoppel which must be by deed, or matter of record, but an estoppel *in pais*. *Hobbs* v. *Lowell*, 19 Pick. 405–409.

The learned judge in this case in discussing what constitutes a dedication says, " a dedication may be presumed from circumstances from which the *assent* of the owner of the soil may be inferred." See also *Beatty* v. *Kurts*, 2 Peters, 566; *Town of Pawlett* v. *Clark*, 9 Cranch; *Maxwell* v. *East River Bank*, 3 Bosw. (N. Y.) 125, where this kind of dedication is fully considered.

2. Robinson, formerly owner of the parcels sold Morrison and Startsman, and at the same time of the open area, having sold off to complainants the portions described,

---

4. As to the alleged alley way of ten (10) feet along the east side of the premises owned by said Robinson, I find that no dedication or devotion thereof to the use of complainants has ever been made, nor was such alley way expressly granted; that such alley way is not a necessity; and that the *implication* of such easement is forbidden by the *express grant* of a way of four (4) feet along the rear of complainants' premises. (On the other hand I conclude that the express grant of the four feet *passage way* does not affect the implication of the grant of *light and air*.) And as to such supposed alley way along the east side, and as to the residue of the premises conveyed to Marquardt, and lying north of Wheeler's north line, the complainants are not entitled to the relief asked.

5. Of the question as to the right asserted by complainants in the *privy*, a license to use which accompanied their several purchases, it is only necessary to say: first, the license granted does not, I find, amount to a covenant running with the land purchased by Marquardt; and second, such right was extinguished by the destruction of the *privy*. See authorities cited by respondents.

6. It is urged that the complainants forfeited any right to the implied grant of necessary light and air by altering the condition of their buildings. I find as to Morrison's, that no *external* changes have been made and have considered the question of light and air in reference to the property as purchased from Robinson. I find that Startsman purchased with the view of immediately building as he did, and that he built in reference to the remaining premises as then held by Robinson. But if complainant Startsman were altogether out of the case the decree recommended for Morrison should, in the judgment of the referee, be the same as now proposed.

with the buildings thereon, having lights, etc., could not afterward build upon that portion retained by him, in such a way as to obstruct the light and air necessary to the buildings on the part sold complainants; and what Robinson himself could not do, Marquardt, his grantee, cannot.

The general rule, we find laid down in Wash. on Easements, p. 31, "that the grant of a thing carries all things as included, without which the thing granted cannot be enjoyed, by which are to be understood, things incident and directly necessary to the thing granted."

The current of authorities will undoubtedly sustain this view, to wit: That the grantor can only avoid the servitude by express reservation, otherwise it passes by implication and attaches to the benefit of the grantee. See the following English authorities: 1 Mod. 55; Hob. 131; 2 Lev. 194; *Palmer* v. *Fletcher*, 1 Ventris, 274; 2 Salkeld, 459; *Roswell* v. *Prior*, Holt, 500. See also *Tenant* v. *Goldwin*, Id.; *Riviere* v. *Bower*, Ryan & Moody, 373; *Moore* v. *Rawson*, 3 Barnw. & C. 332; *Harbridge* v. *Warwick*, 3 Exch. 552; *Aldred's case*, 9 Rep. 58 b; *Palmer* v. *Fletcher*, 1 Lev. 122; *Swansborough* v. *Coventry*, 9 Bingh. 305; *Cox* v. *Mathews*, 1 Vent. 237; *Compton* v. *Richards*, 1 Price, 27, 36, 28; *Robins* v. *Barnes*, Hob. 131; *Coutts* v. *Graham*, 1 Mood. & M. 396; *Martin* v. *Goble*, 1 Campb. 320.

Nor is it against the policy of courts in this country to sustain the doctrine of grants of light and air by implication.

Our courts have carefully adhered to the long line of able precedent English decisions, quoting and relying upon them, affirming and reaffirming them, until they have become an essential part of our law. *Lampman* v. *Milks*, 21 N. Y. 505; *Story* v. *Odin*, 12 Mass. 157; *Gerber* v. *Grabel*, 16 Illinois, 217; *United States* v. *Apple-*

*ton,* 1 Sumn. 492; *Maxwell* v. *East River Bank,* 3 Bosw. 124.

PIERPONT, J., in the case of *Hubbard* v. *Town* (33 Vt. [4 Shaw] 295), after discussing and denying the English doctrine of ancient lights, says, that one who has conveyed to another a building, has no right to make an erection on his own land, which shall shut out the light from the building so conveyed. *United States* v. *Appleton,* 1 Sumn. 492; *Robeson & Maxwell* v. *Pittinger,* 1 Green Ch. 65 — strongly in point. In the case of *Gerber* v. *Grabel* (16 Ill. 217), the precise question is presented, discussed, and the doctrine we contend for maintained, referring to and affirming the English cases cited, and *Story* v. *Odin,* and denying the correctness of *Myers* v. *Gemmel,* and treating the *rule* as merely waived in *Palmer* v. *Wetmore;* citing *Mahan* v. *Brown,* 13 Wend. 263; *The American Tract Society,* 4 Sandf. Ch. 464; see also 31 Conn. 150, in point.

3. When Robinson sold store No. 4, running back the depth of 55 feet, including in the conveyance 11 feet of ground east of the store, not yet built on, which 11 feet extend about half way across the rear of Morrison's store (then the store of Robinson) as between Robinson and Marquardt, Marquardt could not afterward build on the 11 feet and obstruct the light and air passing to Robinson's windows and rooms. The doctrine of implied reservation keeps almost equal pace with and is as fully recognized as that of implied grant. The rule is, that if a man have a house with lights, and sell the same, but retains the land adjoining, he may not build thereon to the damage of the lights in the house sold; also, that if he sells the land and retains the house, the purchaser may not build thereon to the damage of the lights of the house. The rule is laid down with emphasis in the case of *Partridge* v. *Gilbert et al.,* 1 Smith, and 3 Duer,

202; see also *John W. Tracy* v. *Alonzo Atherton et al.,* a case in the Supreme Court of Vermont, for the January Term, reported in the Law Register, September, 1862. This case was determined against the plaintiff on demurrer for the reason that there was no averment of a former unity of ownership or possession of the two parcels of land; but BARRETT, J., argues, that the result must have been otherwise had there been a former unity of ownership of the two parcels, citing *Clarke* v. *Cogge,* Cro. Jac. 170; 1 Saund. 323; *Bullard* v. *Harrison,* 4 M. & S. 387; 15 Com. 423; *Collins* v. *Prentiss,* 15 Conn. 39. The argument that the grant of 4 feet excluded all presumptions of any further or implied grant, is certainly without any force. The grant of a way in express terms can never be construed as intended to supersede an easement of light and air. See *Bowen* v. *Lease,* 5 Hill. 224, 225; *Behan* v. *People,* 17 N. Y. 520; *Poler* v. *R. R. Co.,* 16 Id. 79; 2 Wash. Real Prop. 722, § 35; *Yates* v. *Caldwell,* 7 Mass. 68; *Sumner* v. *Williams,* 8 Mass. 201; *Funk* v. *Voneida,* 11 S. & R., 109; *Roebuck* v. *Dupuy,* 2 Ala. 535; *Andre* v *Welles,* 7 Johns. 259; 10 Gray, 376; 6 Gray, 255; 2 Sandf. 316.

*William Penn Clark* and *William C. Gaston,* for the defendants, submitted an elaborate printed argument, from which the following points and authorities are condensed:

1. The representations alleged in the bill, that Robinson intended to keep the open area open, for a rear drive and for light and air, are not sustained by the testimony.

2. But, if the declarations of Robinson were proved as alleged, they could not help the complainants' case, for the following reasons: First, the alleged declarations at or before the sale, were merged in the deed, and no mistake

Morrison v. Marquardt.

or fraud in the deed is averred. 2 Iowa Dig. 227, 228;
*Howe* v. *Walker*, 4 Gray, 318; *Pilmer* v. *State Bank*, 16
Iowa, 321; *Gelpcke, Winslow & Co.* v. *Blake*, 15 Id.
387; *Jack* v. *Naber*, Id. 450; *Squire* v. *Campbell*, 13
Eng. Ch. 474, *in point*. Second, an easement in real
estate can only be created by deed or prescription. 2
Hilliard on Real Prop. 5, § 16; Id. 6, § 19; *Morse* v.
*Copeland*, 2 Gray, 302; *Cook* v. *Stearns*, 11 Mass. 533;
2 Wash. on Real Prop. 26; *Hewlins* v. *Shippam*, 11 Eng.
Com. Law, 437. Third, and even if this was a parol
license, which if given by deed, would create an ease-
ment, it is *revokable*, although executed by the licensee.
*Morse* v. *Copeland*, 2 Gray, 302; *Fentiman* v. *Smith*, 4
East. 347; *Wallis* v. *Harrison*, 4 M. & W. 538; *Wood*
v. *Leadbitter*, 13 M. & W. 837.

3. *Dedication.* There was no dedication of this open
area, to the use of the surrounding buildings. There
is no evidence of such dedication. No plat was ever
made or recorded. And the evidence of both Robinson
and Judge Miller show that Robinson continued to exer-
cise acts of ownership over the same.

To constitute a dedication of land to a public use, there
must first be an intention to do it, on the part of the
owner. Wash. on Easements, 132, 135; *Maxwell* v. *East
River Bank*, 3 Bosw. 124.

4. The English doctrine on the subject of lights, that
if " one who has a house with windows looking upon his
own vacant land, sell the same, he may not erect upon
his vacant land a structure which shall *essentially* deprive
such house of the light through its windows," is not sus-
tained by the weight of authority in this country, is
inapplicable to our condition, and should not be enforced
in this State.

" A rule thus blindly fettering estates, without any
written evidence of right, and equally annoying to buyer

and seller, should not be adopted here." *Myers* v. *Gemmel*, 10 Barb. 537, decided in 1851, never overruled, and subsequently followed.

" There is, I think, no principle upon which the modern English doctrine on the subject of lights can be supported. It is an anomaly in the law. It may do well in England, * * * but it cannot be applied to the growing cities and villages of this country, without working the most mischievous consequences. It has never, I think, been deemed a part of our law." *Parker* v. *Foote*, 19 Wend. 309.

" Where there is no question of ancient lights (and there is none in this case), the owner of a lot adjoining a house, may so improve and build upon his lot, as to shut up the windows of such house, that are situated in the end or side adjacent to his lot. If this were not so, he would be deprived of the full benefit of his own property. *Palmer* v. *Wetmore*, 2 Sandf. S. C. 316 ; *Collier* v. *Pierce*, 7 Gray, 18, is also in point.

It may be well to state here, generally, that this question is uniformly mixed up in the books with the doctrine of gaining a prescriptive right to light and air, by mere length of enjoyment ; and that in those states where the latter doctrine is repudiated, the other is also. 2 Wash. on Real Prop. 60. This, we think, is particularly true of New York, Massachusetts and Pennsylvania. The authorities bearing on both questions, are generally cited together and have some bearing on each. It is now understood that New York, Massachusetts, Pennsylvania, Maine, Connecticut, South Carolinia and Maryland have discarded the English doctrine of light and air, as unsuited to the condition of this country, while the same is sustained in Illinois, New Jersey and Louisiana, and recognized rather than approved in Alabama. As contradicting and repudiating the English doctrine, see the following

authorities. *Rogers* v. *Sawin*, 10 Gray, 376 ; *Garrig* v. *Dee*, 14 Id. 583 ; *Fifty Associates* v. *Tudor*, 6 Id. 259 ; *Mahan* v. *Brown*, 13 Wend. 216 ; *Atkins* v. *Chilson*, 7 Metc. 398 ; *Pierce* v. *Fernald*, 26 Maine, 436 ; *Ingraham* v. *Hutchinson*, 2 Conn. 584 ; *Cherry* v. *Stein*, 11 Md. 1 ; *Napier* v. *Bulwinkle*, 5 Rich. 311 ; *Hay* v. *Sterrell*, 2 Watts. 231 ; *Haverstick* v. *Sipe*, 33 Penn. 368 ; *Maynard* v. *Esher*, 17 Id. 222.

5. Admitting, however, for the sake of the argument, that the doctrine contended for by the other side is sound law, we contend that it is subject to two qualifications, namely : First, that it is strictly a question of, and depends upon the grant. *The United States* v. *Appleton*, 1 Sumn. 492. And second, that the light and air must be *necessary* to the *reasonable enjoyment* of the premises. In other words, this right passes only as an incident to the grant, and nothing passes by implication except it be necessary. Upon this point see the following authorities. Wash. on Easements, 504 ; *Nicholas* v. *Luce*, 24 Pick. 102 ; *Fifty Associates* v. *Tudor*, 6 Gray, 259 ; 2 Wash. on R. Prop. 30, 31.

And *convenience* is not sufficient to raise the implication of a grant, or pass the easements as an incident to the thing granted. *Nicholas* v. *Luce*, 24 Pick. 102 ; Wash. on Ease. 505.

Believing that the doctrine contended for by the other side as shown by the authorities, is limited and controlled by the peculiar facts of each case, we claim that from the facts of this case it is shown : First, that a grant by implication of light and air, to the extent claimed, is *rebutted or denied* by the circumstances of the case : Second, that if the grant exists, it is limited to the buildings and premises as they stood at the time of the purchase of each, and cannot be enlarged or extended to meet the requirements of alterations in said buildings, nor other

buildings erected subsequently to the grant, requiring more light and air. That this is the law, there can be no question. See *Blanchard* v. *Bridges*, 4 Adol. & Ellis, 174 (31 Eng. Com. Law, 94), which is exactly in point. To the same point are the following authorities: *Swansborough* v. *Coventry*, 9 Bing. 306; 23 E. C. L. 592; *Garritt* v. *Sharp*, 3 Adol. and E. 323; E. C. L. 163; *Martin* v. *Goble*, 1 Camp. 320; *United States* v. *Appleton*, 1 Sumn. 492. Third, that the light and air claimed, *is not necessary to the reasonable enjoyment* of the premises of either of the complainants.

" In a city tenement, an easement for light and air, derived from use and enjoyment, *or implied grant*, can only extend to a reasonable distance, so as to give to the tenement entitled to it such amount of air and light as is reasonably necessary to the comfortable and useful occupation of the tenement for the purposes of habitation or business ; *not the amount which, under some circumstances would be agreeable and pleasant, nor the full amount which the tenement has been accustomed to receive, but the amount reasonably necessary.*" Per SHAW, Ch. J., in *Fifty Associates* v. *Tudor*, 6 Gray, 255.

" To constitute an illegal obstruction of the plaintiff's ancient lights by building, it was not sufficient that the plaintiff *had less light than before ;* there must be such a privation of light as would render the occupation of his house *uncomfortable, and prevent him, if in trade, from carrying on his business as beneficially as he had previously done.* In order to give a right of action, *there must be a substantial deprivation of light.*" Per BEST, Ch. J., in *Back* v. *Stacey*, 2 Car. & P. 465. To the same point are the following: *Parker* v. *Smith*, 5 Carr. & P. 438; 24 E. C. L. 644; *Pringle* v. *Wernham*, 7 Carr. & P. 377; 32 E. C. L. 664; *Wells* v. *Ody*, 7 Carr. & P. 410; 32 E. C. L. 680; *Lampman* v. *Milks*, 21 N. Y. 505.

6. As to the removal of the privy by Marquardt. Marquardt having become the owner in fee of store five, by purchase from Hamilton, as well as of store four, by the deed of June 12, 1866, conveying to Marquardt the land on which the privy stood and that covered by the right of way, these easements, as to stores four and five, by unity of title and estate, were merged and ceased to exist. Wash. on Easements, 516, 518 ; *Hancock* v. *Wentworth*, 5 Metc. 446 ; *Grant* v. *Chase*, 17 Mass. 443.

The question then recurs what are the rights of Startsman and Morrison in this privy? This is to be determined by the language and nature of the grant itself. In terms, it is a mere grant to *use the privy*, so long as it was allowed to remain by the owner, and subject to his will. The grant conferred no right in the soil on which the building stood, nor in the building itself. *Clark* v. *Way*, 11 Rich. Law (S. C.) 621, cited in *Ryan* v. *Wilson*, 9 Mich. 262. And the obligation to maintain the privy, if any such obligation exists, is personal to Robinson, and not upon his grantee, Marquardt. *Fellows* v. *Brown*, 42 New Hamp. 364.

The grant of the use of the privy was, therefore, not a covenant *running with the land*, and by the conveyance to Marquardt in fee, of the land on which the privy stood, it (the privy) became his property, relieved of the right of Startsman and Morrison to use the same. To constitute a covenant running with the land, so as to bind it in the hands of the assignee of the covenantor, who is a stranger to the covenant, two things must concur : First, there must be privity of estate between the covenantee and the subsequent assignee of the covenantor; and, second, the covenant must be to be performed upon or about the land of the covenantor. American note to Spencer's case, 1 Smith's Lead. Cas. 123 ; *Taylor* v. *Owen*, 2 Blackf. 301 ; *Hurd* v. *Curtis*, 19 Pick. 459 ;

*Morse* v. *Aldrich,* 19 Pick. 449; *Keppel* v. *Bailey,* 2 Mylne & K. 518; 7 Eng. Ch.; *Inhab. of Plymouth* v. *Carver,* 16 Pick. 183; *Wheelock* v. *Thayer,* Id. 68; *Dean of Windsor* v. *Glover,* 2 Saund. 302, cited in the opinion of HOSMER, Ch. J., in *Mitchell* v. *Warner,* 5 Conn. 519. And in *The Mayor of Congleton* v. *Patterson,* 5 East. 316; 1 Smith's Lead. Cas. 128.

7. But even if the grant of the use of the privy was binding on Marquardt, as being a covenant running with the land, yet the testimony shows that the privy became a nuisance. Being a nuisance, it was properly removed, and might have been so removed by any other person, as well as the respondent, to whom it was an annoyance. *Eames* v. *N. E. Worsted Co.,* 11 Metc. 570; *Inhab. of Arundel* v. *McCullough,* 10 Mass. 70; *Adams* v. *Beach,* 6 Hill, 271; *Oliver* v. *Loftin,* 4 Ala. 240; *Wetmore* v. *Tracy,* 14 Wend. 250; *Meeker* v. *Van Renssalear,* 15 Id. 397; *Rogers* v. *Stewart,* 5 Verm. 215; 3 Black. Com. 5; *Doane* v. *Badger,* 12 Mass. 64; Wash. on Easements, 564; *Bollard* v. *Butler,* 30 Maine, 94.

8. Whether legally or illegally removed, the destruction of the privy extinguishes the easement. Easement may be lost or extinguished in various ways, as by the unity of the two estates in the same person, by title and possession, the purpose of the easement ceasing by non-user, and the like. The general doctrine is, " that where a right, title or interest is destroyed or taken away by the act of God, operation of law, or act of the party, it is called an extinguishment, and an easement is one of the rights which may be extinguished or destroyed." *Hancock* v. *Wentworth,* 5 Metc. 446; Wash. on Easements, 534; *Sherred* v. *Cisco,* 4 Sandf. 480; *Partridge* v. *Gilbert,* 15 N. Y. 601.

9. There being no power to restore the privy, the only remedy of the complainants, if any they have, is an

action for damages. *Hastings* v. *Livermore*, 7 Gray, 194; *Hancock* v. *Wentworth*, 5 Metc. 446. And when the action is for interfering with the plaintiff's right of easement, and not for an act done on his own land, the form of the action is case. *Baer* v. *Martin*, 8 Blackf. 317; Wash. on Easements, 570.

DILLON, Ch. J.—I. The principles involved in this cause have never been judicially settled in this State. 1. DEDICATION: They are principles of no ordinary importance. by parol. The adjudications elsewhere upon the same or similar questions are not uniform. This court is charged with the duty of deciding, which is the better, or what is the true rule in cases of this character.

Before proceeding further it should be observed that the testimony is voluminous, and upon some points conflicting. So far as the case involves questions of fact merely, it is not proposed to enter into an extended review of the evidence.

So far as it involves questions of law, and principles applicable to future cases, a more extended examination is not only proper, but is required, both by the importance of the cause itself, and the conspicuous ability with which it has been argued by the respective counsel.

It should be further remarked that the defendant admits the existence of the four feet right of way immediately south of the plaintiffs' premises, and claims no right to build thereon.

There is evidence tending to show a dedication or contemplated dedication by Robinson of an alley ten (10) feet in width, on the east side of the premises, extending from the four feet right of way south to the public alley. But the existence or otherwise of the ten feet alley is not put in issue by the pleadings, nor is relief prayed in respect

thereof. Under these circumstances we leave open all questions in relation thereto.

Plaintiff insists that the property on which the defendant now proposes to build was *dedicated* by Robinson as an open area, for access to the various stores, for the convenience of such stores as a place whereon to deposit barrels, boxes, etc., and to supply the rear of the stores with light and air. It is claimed also that the defendant knew of this dedication prior to his purchase, made June 12, 1866, and referred to in the statement of facts. No map or plat showing, and no writing expressing, such dedication, was ever made. But plaintiffs contend that there may be a dedication by parol, and that the present is a case of that character.

That there may be a dedication to *public use* without a deed or other written evidence, is undoubtedly true. But in such cases the intent to dedicate should be clear, and the acts or circumstances relied on to establish such intention unequivocal and convincing. The present case does not meet this requirement. The plaintiffs testify that as an inducement to the purchase of their respective parcels, Robinson stated to them that the area should remain open to the use of all the stores around it, the same as before. But this is positively denied, both by Robinson and Judge Miller, his son-in-law and agent.

It is argued that plaintiffs are corroborated by the almost uniform depth of the various stores, and the fact that the ground had been left open and remained open, without objection, until about the time this suit was brought. But this is more than overcome by the circumstances that Robinson always claimed to own the open ground in question, paid taxes thereon, exercised control thereover; and by the silence of the conveyances to the plaintiffs respecting any such right as that now claimed.

It appears that the conveyances were made with deliberation and examined with care before being received and accepted. They are minute as to other rights and privileges, — rights of way, use of privy, etc., — but silent as to any rights in, to, or over the vacant ground, the alleged dedication of which is now claimed to have been a controlling inducement to the purchase.

If it was understood that plaintiffs were to have such valuable rights in the vacant ground, or if it was understood that it was dedicated to their use or that of the public, it is scarcely credible that they would have been satisfied with deeds making specific mention of "mint and anise and cummin," yet wholly "omitting the weightier matters" of the contract.

Again, Robinson had not the power to leave it all open, as it is claimed he represented he would. For Wheeler had his lease for 99 years, for 90 feet in depth, and up to within 20 feet of plaintiffs' stores. Wheeler might build on or inclose this at his pleasure. He was not restricted as to the depth of the building to be erected by him. When Morrison purchased, Marquardt owned the land south of the window in the cellar and lower story of the Morrison building; and this was known to Morrison, and it is not likely that he would buy, relying upon Robinson's promise that all the land should be kept open.

The maxim, *expressio unius*, etc., or, at least, the reason upon which it rests, would seem justly to apply here. For why mention a right of way four feet wide, if *all* was to remain open for a rear drive, access, place of deposit, etc.?

Again, the weight of testimony decidedly is that the plaintiffs, or at least one of them, wished to purchase of Robinson, to build thereon, the ground which they now claim was dedicated by him as an open area.

Upon the whole, the court is well satisfied that the

plaintiffs' claim of dedication is not established. The case is essentially unlike *Maxwell* v. *East River Bank* (3 Bosw. 125 ; 26 N. Y. 105), and other cases cited on this head by the plaintiffs' counsel.

II. The next point made by the plaintiffs is, that it is an established principle of law, that if one man builds a

2. EASEMENT: right to light and air.

house with windows or doors looking over or opening upon his adjoining vacant land, and sells the house, neither he nor his grantee can afterward build upon the vacant ground, so as seriously to obstruct the flow of light and air to the windows and doors of that house. Plaintiffs do not contend for the English doctrine of a *prescriptive* right to light and air.

But the exact position they take, as expressed in the written argument, is, " That Robinson, the former owner of the parcels sold to Morrison and Startsman (the plaintiffs), and at the same time of the open ground (subsequently sold defendant; and upon which he proposes to build), having sold to plaintiffs their respective parcels with buildings having windows, cannot afterward build upon that portion retained by him in such a way as to obstruct the light and air necessary to the comfortable enjoyment of the plaintiffs' said buildings, and what Robinson himself could not do, Marquardt, his grantee, cannot." Defendant's counsel deny that the above is an established principle of law.

That this principle is recognized by the English courts, admits of no doubt. Mr. Washburn states it thus : " If one who has a house with windows looking upon his own vacant ground, sell the same, he may not erect upon his own vacant land a structure which shall *essentially* deprive such house of the light through its windows." Easements, 492, pl. 5.

Speaking of this subject, Chief Justice TINDAL (in *Swansborough* v. *Coventry*, 9 Bing. 305, C. B. 1833) says :

Morrison v. Marquardt.

" It is well established by the decided cases that where the same person possesses a house, having the actual use and enjoyment of certain lights, and also possesses the adjoining land, and sells the house to another person, *although the lights be new*, he cannot, nor can any one who claims under him, build upon the adjoining land so as to obstruct or interrupt the enjoyment of those lights. The principle is laid down by TWISDEN and WYNDHAM, JJ., in the case of *Palmer* v. *Fletcher*, 1 Lev. 122, ' That no man shall derogate from his own grant.' The same law was adhered to in the case of *Cox* v. *Mathews*, 1 Ventr. 237; by HOLT, Ch. J., in *Roswell* v. *Pryor*, 6 Mod. 116; 12 Id. 215, 635, and lastly, in the case of *Crompton* v. *Richards*, 1 Price, 27 " (A. D. 1814).

The doctrine in question rests upon *Palmer* v. *Fletcher*, *Cox* v. *Mathews*, and *Roswell* v. *Pryor*, above cited. The other cases in England follow these as establishing the principle laid down by Chief Justice TINDAL, in the extract just given. These cases are very briefly reported, and for convenience, and that what was decided may be *exactly* seen, they are given in a note.*

---

* *Palmer* v. *Fletcher* (1 Lev. 122; S. C., 1 Siderf. 167, K. B. 15 Charles II). This was an action on the case for stopping lights. *Absente le Chiefe Justice.* A erected a house upon part of his land, and demised the house to B, and the residue of the land to C, and C, with "*loggs and auters choses sur le* TERRE 'ADJOYNANT," so obstructed the windows of the house as to render them dark and useless. It was held, that neither A, who built the house, nor C, claiming under him, could stop up the existing windows in the house. The reason given is that the grantor of the house could not derogate from his own grant.

KELYNGE and TWISDEN, JJ., differed as to the effect, had the vacant land been sold first and the house afterward; the first contending that in that case the purchaser of the vacant ground might have stopped the lights; the latter denying that this would make any difference. [KELYNGE was right, as shown by subsequent cases: *Tenant* v. *Goodwin*, 2 Lord RAYM. 1093; *White* v. *Bass*, 7 Hurlst. and Norm. 722.]

*Cox* v. *Mathews*, 1 Vent. 239, was decided in 25 Charles II. It was an action for stopping lights. Lord HALE delivered the judgment of the court as follows :

" If a man builds a house upon his own ground, he that hath the contiguous ground may build upon it, although he doth thereby stop the lights of the other house; for *cujus est solum ejus est usque ad cœlum*, unless there be a custom to the

The decisions in this country on the exact point as to whether the right to light and air will pass by implied grant are neither very numerous nor uniform.  As sustaining the doctrine that a vendor of a house cannot afterward, on his adjoining vacant land, make an erection which shall deprive such house of light. see *Story* v. *Odin*, 12 Mass. 157 ; *U. S.* v. *Appleton*, 1 Sumn. 492 (*arguendo* per STORY, J.) ; *Lampkin* v. *Mills*, 21 N. Y. 505 (*arguendo* per SELDEN, J.) ; *Gerber* v. *Grubel*, 16 Ill. 217 (*arguendo*).  Opposed to this doctrine, see *Myers* v *Gemmel*, 10 Barb. 537 ; *Palmer* v. *Wetmore*, 2 Sandf. S. C. 316 ; *Parker* v. *Foote*, 19 Wend. 309 (*arguendo* per BRONSON, J.) ; *Haverstick* v. *Sipe*, 38 Pa. St. 368 (*arguendo* per LOWRIE, Ch. J.)

The grant of easements by implication has been much discussed in the courts of England of late years, as will

contrary, as in London." But, "if a man should build a house upon his own ground, and then grant the house to A, and grants certain lands *adjoining* to B, B could not build to the stopping up of A's lights in that case." This is all of the judgment except the remark of his Lordship that the present was a plain case, for "the defendant fixed boards to the plaintiff's house."

NOTE: That the case before the court was one where the obstruction to the light was upon land *immediately adjoining*, and the defendant had undertaken to nail up plaintiff's windows.

*Roswell* v. *Pryor*, in different phases, was three times before the court; 6 Mod. 116; S. C., 12 Id. 215, 635. It was decided by the K. B. in 2 Anne.

The action was for stopping lights. The question before the Court (6 Mod. 116) was one of pleading, viz.: Whether the declaration was good without saying that the plaintiff's house was an *ancient messuage.* The declaration did not show, though such seems to have been the case, that plaintiff and defendant were lessees under a common lessor.

Lord HOLT's opinion is in the following words:

"If a man have a vacant piece of ground, and builds thereupon, and that house has very good lights, and he lets this house to another, and afterward builds upon a contiguous piece of ground, or lets the contiguous piece of ground to another who builds thereupon to the nuisance of the lights in the first house, the lessee of the first house shall have an action upon the case against such builder ; for the first house was granted to him with all the easements and delights then belonging to it."

NOTE: That the facts of the case are not reported so that its exact nature is known ; also, that the case put relates alone to *landlords'* right to erect upon *contiguous* ground buildings which shall operate to the nuisance of the lights in the lessee's house.

be seen by the following cases : *Pyer* v. *Carter*, 1 Hurlst. and Norm. (1 Exch.) 916, 1857 (as to drain) ; explained, *Polden* v. *Bastard*, 116 Eng. C. L. 257 (use of pump) ; *Glare* v. *Harding*, 3 H. and N. 937 ; *White* v. *Bass*, 7 Hurlst. and Norm. 722, 1862 (as to light) ; *Curriers' Co.* v. *Corbett*, 2 Dr. and Sm. 355 ; *Suffield* v. *Brown*, 10 Jur. N. S. 111 ; *Crossley* v. *Lightower*, 2 Law Rep. Eq. 279, 1866 ; *Clark* v. *Clarke*, 1 Id. 16 ; Id. 442 ; *Martin* v. *Headon*, 2 Id. 425 ; *Dent* v. *Auction Manf. Co.*, Id. 238 ; *Dodd* v. *Burchill*, 1 Hurlst. and Coltm. 113, 119, commenting on *Pyer* v. *Carter*, *supra*. And see, also, Judge REDFIELD's observations in Am. Law Reg. Jan. 1865, pp. 134, 135.

After this glance at the state of the adjudications, the question recurs, Is it a principle in our law, that, if a man sells a house with windows and doors opening on to his vacant ground, he, or his grantee, cannot afterward build upon such vacant ground in such a manner as seriously to obstruct the flow of light and air to such house, without *express reservation* of the right so to do ?

Did the question depend alone upon the authority of the English cases, it would have to be answered in the affirmative. It is justly observed by Mr. Washburn that the decisions as to *implied* easements of light and air are not uniform, nor in all cases satisfactory. Easements, 497, pl. 17. If it be held that there may be implied easements as to light and air — as this implication arises wholly from the condition and circumstances of the estates to which the easement relates, and as this condition and these circumstances are almost infinitely varied— it is easy to perceive the difficulties which environ the practical application of the doctrine.

Perhaps the law as to implied easements generally cannot be said to be fully settled, and this is particularly true in this country as to easements of light and air. The

right to light and air seems in many respects to be differ-
ent in its nature from easements relating to artificial
erections *on* the servient estate, such as drains, gutters,
pipes, etc., or rights of way and the like. · See *Parker* v.
*Foote*, 19 Wend. 309, per BRONSON, J.; *Dodd* v. *Burchell*,
1 Hurlst. and Coltm. 113, 119, per POLLOCK, C. B.;
*Haverstick* v. *Sipe*, 33 Pa. St. 368, 371, per LOWRIE,
Ch. J.

As to *light and air*, I am free to say that I do not
believe the rule, as applied to our situation and circum-
stances, a sound one, which holds that under any cir-
cumstances this right can *by implication* be burdened
upon an adjoining estate, as to prevent the owner thereof
from building upon or improving it as he pleases. I
would reverse the rule and hold that he who claims that
the ten, twenty or thirty feet adjoining him (which in
cities may be very valuable) shall remain vacant and
unimproved, should found such claim upon an *express*
grant, or covenant.

This rule is simple. Grantor and grantee would both
know that the deed is the measure of their rights. Is it
any hardship upon the purchaser to secure by *express*
grant, rights so valuable to him and so detrimental to his
grantor, — rights which, unless limited and defined by
written stipulations, are of uncertain extent and uncer-
tain duration? See remarks of PATTERSON, J., in *Blanch-
ard* v. *Bridges*, 4 Ad. & Ellis, 176. Such a rule also
harmonizes with the purpose of our registration laws. A
denial of an easement by mere implication, as respects
light and air, may, in my judgment, well be, without deny-
ing that other easements of a different character may, and,
in some cases should, be held to exist by implication.

But in the case at bar the court do not regard it as
necessary to deny the general doctrine contended for by
the plaintiff's counsel.

The doctrine of implied easements rests upon the supposed intention of the parties, as deduced from the situation and condition of the two estates to which the easement relates. An easement may be briefly defined to be a charge or burden upon one estate (the servient) for the benefit of another (the dominant).

*3. —— by implication.*

In this case it would be a burden upon the estate retained by Robinson, and afterward sold to the defendant, for the advantage of the plaintiff's estate. This burden or servitude is that this should remain vacant, if to improve it would materially obstruct the passage of light and air to the plaintiff's store.

Now the circumstances surrounding this transaction make it quite clear that it was never intended that this easement should exist. In discussing a similar question, Mr. Justice STORY well remarks: "That in the construction of grants the court ought to take into consideration the circumstances attendant upon the transaction, the particular situation of the parties, the state of the country, and the state of the things granted, for the purpose of ascertaining the intention of the parties." *United States* v. *Appleton*, 1 Sumner, 492, 520; see also 2 Wash. Real Prop. 26; Broome's Leg. Max. 261; Wash. on Easements, 36, pl. 12; *Karmuller* v. *Krotz*, 18 Iowa, 352; *Haverstick* v. *Sipe*, 33 Pa. St. 368, 371.

*4. —— must be clearly given.*

The first circumstance we refer to as evincing this intention is *the language and character of the conveyances to the plaintiffs*. These conveyances contain express language as to several easements. The right of way is an easement. And in the deeds to both plaintiffs that is expressly secured. The right to the use of the privy is an easement. And in both deeds it is stipulated for in terms. The right of Startsman to right of way on the east (two and a half feet in width) was an easement, as

Morrison v. Marquardt.

was also his right to extend the second story of his build-
ing over it.   Both of these were provided for in express
words in his deed.

   And the same is true as respects the right of Morrison
to the roof under the Downey contract with Robinson.
This is also set down in his deed.   Now, these are all
easements, and are carefully secured by the deeds.   If
the parties had contemplated any other easement, such
as the important one of light and air, would it not also
most likely have been secured by the deed ?

   This will be more manifest by other considerations.
We allude next to the *character and situation of the
buildings purchased by the plaintiffs of Robinson.* They
both fronted on Washington street, which was one hun-
dred feet wide.   Morrison's store (No. 7 on the plat) was
built by Robinson ; that is, the first and second stories
were built by him, and the third story by Cook, S. &
Downey, in conjunction with him.   It is only fifty feet
deep, and seventeen feet wide inside.   The stories are
about fourteen feet high.   The front in the *first* story is
an open one composed of glass and iron, the windows
being show-windows ten feet high, with two sets of lights
each.   In the rear of the first story was one door and one
window, beyond which extended the eleven feet embraced
in defendant's original purchase, which was prior to Mor-
rison's purchase.   The rear cellar window was very
small, about eighteen inches or two feet square, with but
two or three inches above the ground.   There was a front
cellar window, and the outside entrance to the cellar was
in front.   The second story had two large windows in
front and one in the rear.   When Morrison bought, the
only access to the second story was by a stairway in the
rear of the first story.   The first and second stories had
one room each, and were " finished off for one store-
room, counter and shelves below, and shelves above."

Such was the condition when Morrison purchased. Since then, Morrison has entirely changed the interior arrangement. The stairway to the second story has been removed; an entrance has been obtained to the second story from the west; the second story has been partitioned off into two rooms, and is used for offices, the rear window being relied on for light to the back office.

When Startsman purchased No. 8, there was upon it a one story frame house with an open front, and with an addition extending back to near the south line. In the rear there was but one small window of but six or eight panes of glass. This old building was removed, and the present structure erected by Startsman, with an open front like Morrison's in the first story, and three windows in the front of the second story. In the rear of the first story there is a sash door, and a large window. It is proper to observe that Robinson knew, when he sold, that Startsman intended to replace the frame building with a new structure. These circumstances have been mentioned for the purpose of showing that these buildings, for the purposes for which they were erected, and in the condition in which they were sold, were not *essentially dependent upon the rear windows for light.* See Wash. on Easements, 504, pl. 26 ; 502, pl. 20; *Blanchard* v. *Bridges*, 4 Adol. and Ell. 174 ; *Fifty Associates* v. *Tudor*, 6 Gray, 255, approving *Back* v. *Stacey*, 2 Car. and P. 465 ; *Parker* v. *Smith*, 5 Id. 438 ; 7 Id. 377, 410, and recent English equity cases before cited, as to what amount of light a party is entitled to under an implied grant or prescriptive right.

If not thus dependent upon the rear openings for " such an amount of light and air as is reasonably necessary to the comfortable and useful occupation " of the building, the necessity for an implied grant does not exist, and the

presumption that there was such a grant is very much weakened, if not entirely overthrown.

Surely, such an easement, uncertain in its extent and duration, without any written or record evidence of its existence, fettering estates and laying an embargo upon the hand of improvement which carries the trowel and the plane, and, as applied to a subsequent purchaser, against the spirit of our recording acts, and not demanded by any consideration of public policy—surely, such an easement should not be held to exist by mere implication, when such implication originates in no reasonable necessity. Mr. Washburn, assuming that there may be an implied grant of such easements, observes that " the test seems to be whether what is claimed is reasonably necessary to the enjoyment of the part granted, and where that is not the case, it requires descriptive words of grant in the deed, to create an easement in favor of one part of a heritage over another." Easements, 61 pl. 42 ; 36 pl. 12 ; 504 pl. 26.

Again he says the implied easements (according to the tendency of the cases) will be held not to exist, except in instances where, if the grantor were to build on his vacant land, the owner of the house would be " virtually deprived" of the enjoyment thereof. Id. p. 502 pl. 20.

But there are other strong circumstances in the *situation of the property* against the existence of the supposed easement. Defendant, who now proposes to build, purchased his store (No. 4), before Morrison did, and at the same time purchased eleven feet in the rear. This eleven feet extended east beyond the rear window of Morrison. Robinson retained no rights in this eleven feet. Could not defendant at once have built upon this eleven feet, although it should obstruct the light to (store No. 7), still retained by Robinson ?

Plaintiffs' counsel have seen the importance of this

point, and argue that the defendant could not build on the eleven feet so as to darken the windows in No. 7, even though Robinson were yet the owner thereof. In their written argument they say: " The doctrine of *implied reservation* keeps almost equal pace with, and is as fully recognized as, that of *implied grant*. The rule is, that if a man have a house with lights, and sell the same, but retain the land adjoining, he may not build thereon to the damage of the lights in the house sold; *so if he sells the land and retains the house, the purchaser may not build hereon to the damage of lights of the house*."

Such, it seems to us, cannot be the law. Such a doctrine, as applicable to cities, would be intolerable. The vendor sells the land, *makes no reservation of any rights therein*, parts with his dominion over it, receives his pay for it, and when his vendee proposes to build, he stays his hand with an *implied reservation*, and the vendee finds that he has made a barren, unprofitable purchase; that he owns and pays taxes upon a lot, to afford the vendor an unobstructed supply of air and sunlight. Lord HOLT denied such to be the law in *Tenant* v. *Goldwin*, 2 Ld. Raym. 1093, and his opinion was recently (A. D. 1862) approved by the Court of Exchequer, in *White* v. *Bass*, 7 H. and N. 722 (denying the doctrine of *implied reservation* of an easement for light). See also *Curriers' Co.* v. *Corbett*, 2 Dr. and Sm. 355; *Suffield* v. *Brown*, 10 Jur. N. S. 111; *Crossley* v. *Lightower*, 2 Law Eq. 279, 1866; Wash. Easements, 35, pl. 11; Id. 494, pl. 10; *Johnson* v. *Jordan*, 2 Metc. (Mass.) 234; *Haverstick* v. *Sipe*, 33 Pa. St. 368, 1859.

Therefore, the defendant had the right to build and darken the rear window of No. 7, and Robinson could not resist it. His right, then, to build was not affected by the subsequent sale of that store by Robinson to

Morrison. This being so, there was no implied grant in the sale to Morrison from Robinson, that the windows should remain unobstructed by buildings in the rear. The store of Startsman was not then erected. Although Robinson knew he intended to build, there is no evidence that he knew such building, when erected, would *essentially* or *reasonably need* light and air from the rear; and, hence it seems difficult to say that there was an implied grant of such an easement. This consideration alone, it seems to us, is conclusive against the claim of·Startsman. Another and quite important circumstance against the implied easement of light and air over the entire vacant ground owned by Robinson at the time of his sales to the plaintiffs, is the *express grant of a four feet right of way*. This has before been alluded to in respect to other questions in the case.

In all the cases we have examined, in which an implied grant of light and air has been recognized, the house sold, and the land to which the easement has been attached, were *adjoining*. See *Palmer* v. *Fletcher*, *Cox* v. *Mathews*, *Roswell* v. *Pryor*, and other cases before referred to and stated.

We have found no case, although we have directed particular attention to the point, in which an implied grant of light and air has been holden to exist when the vendor, at the time of the sale of the first parcel, laid out a space or passage between it and the portion of the heritage or estate retained by him. The servient tenement is thus disconnected from the dominant. It is argued by plaintiffs' counsel that this is simply a *way*, and has no reference to light and air. So is a street or an alley a way; but it is also an open space which admits the flow of light and air. The object of this way in the present case was to secure a passage to the privy, also an outlet through the right of way on the east, and possibly

a right of way to the contemplated ten feet alley; and also to secure the plaintiffs' estate against the erection of buildings nearer than the four feet. If the *aliunde* testimony is competent to show the purposes for which the private way was laid out by Robinson, it shows that these were the purposes.

Without positively deciding that there may not, under any circumstances, be an implied easement of light and air, we hold that the circumstances before enumerated negative any such implication or easement in the case under consideration.

III. The next and only remaining question relates to the plaintiffs' rights in respect to the privy. This was situated on land owned by Robinson at the time he sold to the plaintiffs, and it adjoined the private way in the rear of their stores. The plaintiffs' deeds, in express terms, granted to them " *the right to the use of the privy.*" The right was embraced in the consideration paid for the property. It was not revocable at the will of Robinson or his grantee. It would exist at least as long as the privy should stand and have a right to stand. Defendant purchased the land upon which it was situated, and removed it at night, without the consent of the plaintiffs. He justifies this act upon two grounds: First, he claims that the vault was full, and hence the easement was at an end. Second, if this is not so, he claims the structure had become a nuisance, and therefore he had a right to abate it, and he abated it by removing it.

5. NUISANCE: abatement.

The first ground is not supported by the evidence. The vault was not entirely filled, and if it were, we think the plaintiffs might, if they saw proper, remove the contents and thus continue the right to the use of the structure. The point is made that it was Robinson's duty to keep it in order, and that the defendant, by his purchase, takes

Morrison v. Marquardt.

Robinson's place. But the deed is silent upon this point, and it is not essential to determine upon whom the duty of keeping it in order would rest. See Wash. Easements, ch. 6, § 1, p. 564. Nor do we think the defendant was justified in removing it with strong hand and against the plaintiffs' wishes, on the ground that it was a nuisance. A party may, with his hand, abate that which is to him a nuisance, but such abatement does not consist in the destruction of the property unless such destruction be absolutely necessary. It is the offensive use of it that he is justified in abating. *Barclay* v. *Commonwealth*, 25 Pa. St. 503; 2 Hilliard on Torts, 95. Plaintiffs asked to try disinfectants. Defendant refused, claimed the right to remove it, and did remove it the same night.

The right to the use of this outhouse was property; and the plaintiffs' right could not be thus summarily determined by the defendant. Defendant claims that the plaintiffs' right to use the privy ended when Robinson conveyed to him; that the grant of the use is not a covenant running with the land. The plaintiffs' rights were in the nature of a burden upon the estate on which the privy stood. The conveyance to the defendant of the estate did not disburden it of this servitude; particularly is this so, as the deed to the defendant is expressly made subject to the plaintiffs' rights.

Again, the defendant claims " that whether it was removed legally or illegally, the destruction of the privy

6. —— restora- extinguished the easement." If the plaintiffs
tion.         had destroyed it, this might well be held to extinguish the easement; but not when such destruction is by the party owning the estate which owes the servitude. The law holds out no such bonus for the commission of torts; nor does it allow a party to gain and base a right upon an illegal act.

Again, it is contended that being destroyed, the only

remedy of the plaintiffs is an action for damages, as the court has no power to restore the privy. But it has the power to order the defendant to restore it, or to allow this to be done by the plaintiffs at his expense.

As respects the privy, we think the plaintiffs have a right under the circumstances above stated, to be put *in statu quo*. The cause will be remanded with directions to the court below to dismiss the plaintiffs' bill, except as to the rights in relation to the privy; to enter a decree that defendant shall restore this, or in default thereof that plaintiffs may do so, and the expense, or so much thereof as may be equitable, to be charged to the defendant. The decree will also enjoin the defendant from erecting his proposed building so as to interfere with the site of the privy. Plaintiffs may, if they elect, claim damages and waive the right to a restoration of the privy. All rights in relation to the supposed ten feet alley on the east of the premises to remain open, not being embraced in this adjudication.

Reversed.

---

BARLOW v. McKINLEY.

Conveyance: COVENANT AGAINST INCUMBRANCES: RIGHT OF WAY: KNOWLEDGE BY GRANTEE. A right of way for a railroad is an incumbrance for which a grantee may recover under a covenant against incumbrances, though he had full knowledge of such incumbrance at the time he accepted the deed. The case of *Van Wagner* v. *Van Nostrand* (19 Iowa, 422) followed.

*Appeal from Iowa District Court.*

TUESDAY, JANUARY 28.

ACTION upon the covenant against incumbrances contained in a deed conveying eighty acres of land. Breach,

that the M. & M. Railroad company held a right of way conveyed to it by the defendant prior to the covenant sued on. Defense, that plaintiff knew of the existence of the right of way, and that it was in law no incumbrance. The cause was tried to the court, and judgment rendered for plaintiff for forty dollars. The defendant appeals.

*C. Hedges* and *J. H. Murphy & Bro.* for the appellant.

*H. M. Martin* for the appellee.

COLE, J. — But two questions are presented by the transcript:

1. Is the right of way for a railroad an incumbrance? An incumbrance is defined to be a right in a third person in the land in question, to the diminution of the value of the land, though consistent with the passing of the fee by the deed of conveyance. Bouv. Law Dic. A public highway is held to be an incumbrance in all the New England States. Rawle on Cov. for Title, pages 115 to 120, and authorities cited in the notes. As to the right of way for a railroad being an incumbrance, see opinion of REDFIELD, J., in *Butler* v. *Gale* (1 Williams [Vt.] 742), and see same case as to remedy for covenantor when such incumbrance was considered and allowed for in the sale, etc. Whether a public highway is an incumbrance in this State we need not now decide; but upon both principle and authority we hold, that a right of way for a railroad is an incumbrance.

2. Can a party recover upon a covenant against incumbrances, when he had full knowledge of the existence of the incumbrance at the time he accepted the covenant? This point was decided in the affirmative by this court in *Van Wagner* v. *Van Nostrand* (19 Iowa, 422), following

the weight of authority. See the cases there cited. With that decision we are still content.

Affirmed.

## STARK v. NOBLE & BROTHER.

1. Partnership: CONTRACT: TRANSFER OF "GOOD WILL." Where partners sold their stock of goods, and in the contract of sale agreed to transfer the "good will" of their business, and that they, or either of them, would not again enter into the same busi. ness in that locality, it was held that the transfer of the "good will," and the undertaking not to again set up the same business, was a part of the partnership contract, binding on both members of the firm, and for a violation of which they or either of them were liable.

2. ——— BREACH AFTER DISSOLUTION. Nor would such liability be changed by the fact that the breach of such undertaking was by one of the members after the dissolution of the firm.

3 New trial: CONFLICTING EVIDENCE. A new trial will not be granted where the evidence is conflicting and it was the province of the jury to decide thereon.

*Appeal from Warren District Court.*

TUESDAY, JANUARY 28.

THIS is an action at law, upon a promissory note made by appellees and payable to Stark & Clapp, a mercantile firm, by whom it was indorsed, before maturity, to appellant, one of the partners of the firm. Appellees set up the following defense to the action: That the note was given in part payment for a stock of goods purchased by appellees of the said Stark & Clapp, who, at the time, were doing a mercantile business in Indianola; that Stark & Clapp, in the contract for the sale of the goods, agreed to transfer the "good will" of their business, and that

they, or either of them, would not again enter into the same business, in the town of Indianola; that, in violation of the terms of the contract, Clapp did establish and maintain, soon after the sale to appellees, a mercantile business in Indianola, whereby appellees sustained great damage, which is pleaded as a set-off to the action. Verdict and judgment for appellant, in the sum of $95. The amount claimed to be due upon the note is about $400.

A motion of appellant for a new trial, on the ground of error in the instructions to the jury, and because the verdict is contrary to the evidence, was overruled. The seventh instruction given by the court is to this effect: "That, if Stark & Clapp, or either of them, during the time the trade was being made, promised defendants not to go into the said business, they will be bound by such promise."

Appellant asked the court to instruct the jury substantially as follows:

1. That he is not liable on a contract whereby he is charged with the debt or default of Clapp, unless such contract is in writing and signed by him or his agent.

2. That he is not liable for the individual act of Clapp after the dissolution of the firm of Stark & Clapp. These instructions were refused. To the decisions of the court in overruling his motion for a new trial, in giving the said instruction and in refusing to give the instructions asked by him, appellant excepted, and now assigns the same for error in the record.

*Todhunter & Williamson* and *Polk & Hubbell* for the appellant.

*P. Gad Bryan* for the appellees.

BECK, J. — I. The sale of the goods, on the part of Stark & Clapp, was a partnership contract, binding upon

Stark v. Noble & Brother.

1. PARTNER-SHIP : CONTRACT : transfer of good will. both members of the firm. The transfer of the "good will" of their business, and the undertaking not to set up and maintain again the same business, was a part of the contract, for the violation of which, by either or both of the parties, either or both are liable. The contract was not an undertaking on the part of Stark to answer for the default of Clapp, but was a stipulation binding both, and to be performed by both. The failure of one to perform its conditions renders both liable. One of the partners, contracting for the firm in the presence of the other, had the power to make the contract, and it was binding upon the other, in the sense in which plaintiff had reason to believe defendants understood it. Regarding the seventh instruction given by the court, in the light of the evidence, to mean this, it is correct, and the first instruction asked by appellant was properly refused as irrelevant.

II. The acts of Clapp, which are alleged to be the breach of the contract, were done after the dissolution 2. —— breach after dissolution. of the firm, but the contract was entered into before such dissolution. The partners were liable after the dissolution upon the contract for the breach thereof, and as no objection was made in the court below, or is made here, to Stark's separate liability upon the contract, the damages sustained by appellees on account of its breach are properly a set-off in the action on the note. Appellant's second instruction was, therefore, properly refused by the court.

III. The testimony upon the issue of the existence of the contract is conflicting, but we cannot conclude that the verdict was not the result of a sound and honest exercise of judgment on the part of the jury.

3. NEW TRIAL: conflicting evidence.

The court below very properly refused to disturb the verdict.

Affirmed.

## DUNTON v. WOODBURY.

1. Homestead: ABANDONMENT. Stronger and clearer proof of the abandonment of a homestead is required where the lien sought to be enforced arose during actual occupancy, than where it arose when the party claiming the exemption was not in the actual possession. *Davis, Moody & Co.* v. *Kelley,* 14 Iowa, 523.

2. —— LENGTH OF ABSENCE: CASE DISTINGUISHED. While the length of absence from the homestead is not conclusive of its abandonment, yet, where there are no circumstances or acts of the party manifesting an intention to return and occupy it as such, the length of absence becomes an important fact in determining that question. The case of *Fyffe* v. *Beers* (18 Iowa, 4), distinguished from the present one.

3. —— FACTS HELD SUFFICIENT TO SHOW ABANDONMENT. Absence from the homestead for about three years without there being manifested, by any circumstances, an intention to return; repeated offers to sell or trade it during that time, and the expression of an intention not to return to it; the creation of the debt sought to be enforced during such absence, and the giving of an order to the creditor authorizing him to collect of the tenant, to whom the homestead was rented, sufficient rent to satisfy it,— were held sufficient to show an abandonment, and to render the place claimed as a homestead liable to the creditor's claim.

*Appeal from Marshall District Court.*

TUESDAY, JANUARY 28.

SUIT in equity to enjoin the sale of an alleged homestead under execution. The plaintiff was formerly the wife of one Printz, and while she was so, and on the 13th of May, 1857, she acquired the title to a house and lot in Marshalltown — the property in controversy. The plaintiff, with her husband, Printz, and their children, lived upon the property as their homestead, for about two years after the purchase. They then rented the property in controversy, and moved to Indiantown in Tama county, and remained there for some time, but precisely how long

Dunton v. Woodbury.

is not shown; they then rented and moved upon a farm in Marshall county, some eight or ten miles from Marshalltown. Shortly after their removal to the farm, the then husband of plaintiff died, leaving three children (boys), who continued to live with plaintiff on the same farm. On the 16th of February, 1861, and while the plaintiff was living on the said farm, she executed to the defendant, Woodbury, a promissory note for fifty-five dollars and thirty-two cents. The consideration of the note was the relinquishment of a claim against the estate of her deceased husband for that amount for necessaries furnished the family in his life-time. See *Lawrence* v. *Sinnamon* (present term). Upon the same paper with the note was this agreement: " I hereby agree that G. M. Woodbury shall have the rent of my house in Marshall, and authorize him to collect the same to the amount of the above note and interest, with the exception of the taxes, which are first to be paid out of said rent. Marshall, February 16, 1861."

In February, 1862, the plaintiff moved back to Marshalltown and took possession of the property, and has continued to reside therein with her children ever since, and with her second husband, Solomon Dunton, since the summer of 1862.

There were two payments made upon the note in 1861, and one in 1864; and in April, 1865, suit was brought on the note before a justice of the peace, and judgment recovered upon a contested trial, for twenty-nine dollars and twelve cents, beside costs. A transcript of this judgment was filed in the clerk's office of the District Court of Marshall county, and execution issued thereon.

This suit was brought against the sheriff and Woodbury, to enjoin the levy and sale of the property in controversy, thereunder. It is the only property liable to execution, which the plaintiff owns.

The District Court rendered a decree for plaintiff perpetually enjoining defendants from levying upon or selling said property for the satisfaction of said judgment, and for costs of suit. The defendants appeal.

*Boardman & Brown* for the appellants.

*L. W. Griswold* for the appellee.

COLE, J.— The sole question presented in this case is as to the abandonment of the homestead. That the 1. HOMESTEAD: property in controversy was once the homeabandonment. stead of plaintiff is not denied. That the indebtedness for the payment of which it is sought to be subjected was contracted while the plaintiff was not in actual possession of the property, is also admitted. It has been held by this court that it requires stronger and clearer proof of abandonment when the lien set up is claimed to have attached during actual occupancy, than where it arises when the party claiming the exemption was not in actual possession. *Davis, Moody & Co.* v. *Kelley*, 14 Iowa, 523.

The plaintiff left the property, rented it to tenants and was out of the actual occupation of it for about 2. —— length three years. During this time she had no of absence: item of personal property upon the premises, case distinguished. nor is she shown to have been upon them in person, or exercised any care thereof. In these particulars the case is different from *Fyffe* v. *Beers*, 18 Iowa, 4. While the length of the time of absence from a homestead is not conclusive upon the question of abandonment, yet, where there are no circumstances or acts of the party, manifesting a purpose to return and occupy it as a homestead, the length of time becomes an important fact in determining the question of intention to return.

It is proved by two witnesses beside the defendant Woodbury, that the plaintiff made efforts to trade or sell the property, and expressed her purpose not to return and occupy it, giving as a reason therefor that Marshall-town was not a good place to raise her boys, and that she desired and intended to live and keep them on a farm. It is, however, probable that a desire, though often expressed, to sell or trade the property, would not be, of itself, proof of an abandonment. Nor would the expression of a purpose not to return to the occupation of the property, made in the course of a negotiation for its sale, be conclusive evidence of abandonment.

But in this case there are facts sufficient to render the property liable to the payment of the defend-ant's claim. These facts may be briefly stated as follows:

3. —— facts held sufficient to show aban-donment.

The absence from the homestead for about three years, without there being manifested, by a single circum-stance or act, any purpose to return and occupy it again as a homestead. The repeated offers to sell or trade the property for a farm, and the frequent expression of her purpose not to return to the property — one of these being made to the defendant Woodbury at the time he took the note which became the basis of the judgment and execution thereon sought to be enjoined by this action. The giving of the agreement to defendant Woodbury, authorizing him to collect the rent sufficient to pay the note, thereby indicating that defendant might look to this property for the payment of his claim. These facts, when taken in connection with the further one, that the debt was created while the plaintiff was not in the actual possession of the property, make such a case as, in our opinion, renders the property liable to the execution.

Whether these facts would make it liable, if the debt

had been contracted while plaintiff was in the actual occupancy of her homestead, we need not now determine.

Reversed.

MEANS *et al.* v. HENDERSHOTT & BURTON.

Reward: ARREST BY PEACE OFFICERS. Where peace officers arrest a criminal for whose apprehension a reward is offered, under a warrant issued by a magistrate upon the information of a third party who actually discovered the criminal, for which the officers receive their full legal fees, and retain, of money found on the prisoner, a sum to pay their expenses in delivering him to the sheriff of the county where the crime was committed, such officers are not entitled to the reward, unless clearly included within the terms of the offer.

*Appeal from Wapello District Court.*

TUESDAY, JANUARY 28.

PLAINTIFFS claim, that, in 1860, a number of citizens of Wapello county offered a reward in writing, pledging therein the payment of $500 for the arrest of McComb, the murderer of Laura J. Harvey; " that in March, 1864, plaintiffs found the said McComb in Davenport, arrested, brought and delivered him to the sheriff of Wapello county, where the murder was perpetrated, and where he remained until tried, sentenced and executed, etc., whereby they were entitled to the reward," etc. It is further stated " that defendants, claiming to act under some pretended assignment or authority, obtained said subscription, and have collected thereon said reward, and refuse to pay the same over," etc.

The answer is in denial, and also avers that plaintiffs were, at the time of the alleged arrest, peace officers; made the same in the line of their duty, under a warrant

issued on information filed by one Cleaveland, who discovered McComb, and caused his arrest and apprehension, and who was thereby entitled to said reward, and being so entitled, transferred his right therein to defendants, whereby they were entitled to receive and collect the same, etc.

Trial to the court, judgment for defendant, and plaintiffs appeal.

*Stiles, Hutchison & Dixon* for the appellants.

*Hendershott & Burton* for the appellees.

WRIGHT, J. — The only point made in appellants' argument is, that, under the testimony, the judgment should have been in their favor.

Under the proof, we are inclined to the opinion, that plaintiffs, two of them at least, arrested McComb, as peace officers, under a warrant issued by a magistrate on the information filed by Cleaveland; that they were paid their full legal fees therefor, and, in addition, retained for their expenses, in delivering him to the sheriff of Wapello county, fifty dollars found on the person of the prisoner; that Cleaveland actually discovered the murderer, and caused his arrest. And, thus believing, we hold, that, unless the terms of the offered reward clearly included plaintiffs, or persons acting as they were, this judgment was right.

The record recites, that plaintiffs offered in evidence this "subscription list or reward," but it is not embodied in the record, nor its contents or conditions in any other manner brought to our attention. We cannot say, that persons acting as plaintiffs were clearly included in its terms. Indeed, we do not know but that its terms expressly excluded officers acting under process. We

cannot presume a state of facts to show error.  Presumptions are to be indulged in support of, but not against, a judgment.  If plaintiffs had no right to the reward, it matters not what the rights of Cleaveland or his assignees, the present defendants, may be.

Affirmed.

---

## LAWRENCE V. SINNAMON et ux.

1. **Limitation, statute of: DEMURRER.** If a petition shows affirmatively that its course of action is barred by the statute of limitations, the objection may be taken advantage of by demurrer. Rev. §§ 2961, 2962.

2. —— HUSBAND AND WIFE: FAMILY NECESSARIES. In an action commenced in 1866, against a husband and wife for the price of necessaries chargeable, under § 2507 of the Rev., upon the property of both, the petition averred the following *facts,* and thereupon asked judgment : That between April, 1857, and January, 1858, plaintiff sold to, and charged in the name of, the husband certain articles of necessaries for the use of the family; that, in January, 1858, he received from the husband his note for the amount of the account, not as payment thereof, but merely to change the form of evidence, and balance his books in accordance with the usual custom of merchants. Demurrer to the petition, on the ground, that it appeared therefrom, that the cause of action was barred by the statute of limitations. *Held,*

   1. That, as to the husband, the action was taken out of the statute by his written promise to pay.

   2. That, as to the wife, the husband, being the head of the family, was not only authorized to make the purchase in his own name, but to change the form of evidence of the indebtedness arising therefrom, by executing his note for the account, and that thereby the case was taken out of the statute as well to her as to the husband.

*Appeal from Wapello District Court.*

TUESDAY, JANUARY 28.

THIS action was commenced November 15, 1866.  The petition makes this case:  From April, 1857, to January,

1858, plaintiff sold to the defendant, Thomas Sinnamon, goods and merchandise as per account annexed, some to the husband, some to the wife, but all were purchased and received for the use of the family of defendants; were necessaries, were thus used, the expense thereof was a family expense, within § 2507 of the Revision, and properly chargeable upon the property of both; that these articles were charged, in accordance with the usual custom of merchants, to the husband, and in accordance with a like custom in balancing the books, plaintiff, as evidence of said indebtedness, in January, 1858, took the husband's note for the amount of said account, not as payment, nor with that intention, nor that it should operate as a release of plaintiff's rights or defendant's liability, but merely to change the form of evidence of said indebtedness. The claim is for judgment against both defendants.

Defendants demurred, because it appeared affirmatively, from the petition, that plaintiff's cause of action was barred by the statute of limitations. This demurrer was sustained, and plaintiff appeals.

*Stiles & Hutchison* for the appellant.

*Hendershott & Burton* for the appellee.

WRIGHT, J. — If the petition shows affirmatively that the cause of action is barred, then, under the statute, the

1. LIMITATION, STATUTE OF: demurrer. objection may be taken advantage of by demurrer. Rev. §§ 2961, 2962.

We then inquire, does this affirmatively appear? As to the husband, we answer most unhesitatingly, clearly not.

2. —— husband and wife: family necessaries. Plaintiff counts upon the facts, and this was needful to show the wife's liability. But, though the last item of the account is dated in January, 1858, and though without more the action would have been barred in July, 1863 (§ 2740, Rev. Cl. 3), it must be

remembered that the husband, in 1863, promised in writing to pay the very debt, and the remedy was, therefore, not barred as against him, at least, for ten years from the writing of that note. As to him, the case stands as though he had made a new promise to pay any other indebtedness, whether the prior promise was implied or express, verbal or in writing. And this is true, whether it did or did not operate to satisfy the pre-existing debt.

But manifestly the important question is, whether plaintiff's remedy against the wife is barred by the statute. And here, also, we feel constrained to hold that the court below errred.

By § 2507 of the Revision, it is declared that the expenses of the family, the education of the children, and such other obligations as come within the equity of the provision, are chargeable upon the property of both husband and wife or either of them, and in relation thereto they may be sued jointly, or the husband separately. The prior section provides that the husband is not liable for the separate debts of the wife, nor is her separate property liable for his debts; but the separate debts of the wife, thus referred to, include only contracts made in relation to her separate property or such as purport to bind herself only. But, because the expenses of the family and the education of the children should, to the extent of their property, be met by each, the legislature has provided, that, for just such expenses, their property shall be chargeable. Not that the wife is liable generally, though the husband is, but that the property is liable. And here we remark, that there is no objection that the petition seeks a general judgment against the wife. Nor is it suggested that there is nothing to show that she has property upon which this debt should be a charge. The only point made is that the claim is barred. The husband is the head of the family. He determines primarily what is

needed for it. He buys, furnishes, contracts debts, all in his own name, for the support and welfare of the family. Her name need not be known. In the absence of fraud and collusion between the creditor and the husband, or some other circumstances giving to the wife peculiar equities, these debts, though contracted by the husband, to the extent of their property, bind both; and his acts, agreements and promises, are alike obligatory upon both.

If he contracts a debt for the education of the children, and gives his note payable three years thereafter, the cause of action accrues as against both at the maturity of the note, and not at the time the debt was contracted. So if he buys flour, meal, sugar, coffee, butter and other articles, and shall, at the time of obtaining the credit, promise to pay in one, two or three years thereafter, the statute does not run as to either, until the time of payment expires. And the same is true where he, after the articles or goods are furnished, gives his promise to pay; the maturity of this promise being the time when the cause of action accrues. These expenses are in the nature of equitable charges upon the property of each. The fact that the form of evidence of the indebtedness is changed from an account to a note makes no difference, unless, indeed, there was an agreement or understanding that the creditor looked alone to the husband — a fact which is expressly rebutted by the averments of the petition. It is not unlike a mortgage executed by husband and wife to secure the note of the husband. The renewing of the note by the husband does not discharge the lien. Nor in such a case would the statute run in favor of either from the maturity of the first note, but of the new one.

Our law is liberal in protecting the rights of the wife, in relation to her property real and personal. But it has not gone so far as to abolish the headship of the family,

Stephenson v. Walden.

nor to take from the husband the right to exercise his best judgment and discretion in the management of his affairs. They are alike interested in the education of the children and for the support of the family. For the expenses thereof it is both right and proper that the property of each or both should be liable. She, as a rule, must be governed by his contracts in relation to these matters. The law does not contemplate the consent and action of both. The merchant, grocer, miller or teacher need not wait until she joins with him in the request for credit, or before making a contract to furnish articles for the family or the education of their children. But they may contract with him as one whose being is not merged in that of his wife, and whose contracts, within the provisions of the statute, are chargeable upon the property of both. And if he in good faith obtains an extension of time for the payment of such an indebtedness, she is entitled to whatever advantage he thus gains, and must as a rule be held to the same remedies and defenses.

Reversed.

STEPHENSON v. WALDEN et al.

Assignment: OF ACCOUNT AGAINST COUNTY: ATTACHMENT OF COUNTY WARRANT: NOTICE. The levy of an attachment upon a county warrant in the hands of the clerk of the District Court, issued upon an account of the defendant against the county, but which, at the time of the levy, he had assigned for a valuable consideration to a third party, of which the clerk received notice before, but the plaintiff not until after, the levy, gives to the attaching creditor no right on the warrant as against such third party. The creditor in such case acquires by his levy no greater interest than the debtor had in the property attached.

*Appeal from Appanoose District Court.*

WEDNESDAY, JANUARY 29.

THE plaintiff, Robert Stephenson, brought suit before a justice of thé peace, against Joseph Walden, upon an account, and caused an attachment to be issued, which was, on the 6th day of August, 1867, levied upon a county warrant, issued by Appanoose county in favor of Joseph Walden, for thirty-three dollars; the sheriff levying the writ received the warrant from the clerk, and receipted to him therefor. After this levy, to wit, August 13, 1867, Bradley & Campbell filed their petition as intervenors, showing that the county warrant was issued to said Walden for his services in assessing Lincoln township in said county, and that Walden, on the 26th day of April, 1867, assigned, in writing, his account for said services to them, of which they notified the clerk; and that the warrant was issued in payment of the account. They justice of the peace rendered judgment in favor of the plaintiff, against Walden, for the account sued on, and subjected the county warrant to the payment of it; and also dismissed the petition of the intervenors, and rendered judgment against them for the costs thereof. The intervenors appealed to the District Court, where judgment was rendered in their favor.

From this last judgment the plaintiff appeals to this court.

*Withrow & Wright* for the appellant.

*Amos Harris* for the appellees.

COLE, J. — The District Court found as facts, that Walden did assess Lincoln township for 1867, and the county owed him for that service; that, on the 25th day of April,

1867, he made out, swore to and filed with the clerk, his account therefor; that on the next day, April 26, 1867, Bradley & Campbell bought the account of Walden, and paid him full value therefor, and received from him an order in writing upon the clerk for the amount due him for his said services; that, before the levy of the attachment, Bradley & Campbell notified the clerk of their right to the warrant; that the writ of attachment in favor of plaintiff was levied upon the warrant on the 6th day of August, 1867, and that plaintiff had no notice of Bradley & Campbell's claim to the warrant, until after the levy. The District Court, upon these facts, rendered judgment in favor of the intervenors, Bradley & Campbell. This judgment, upon the authority of *Allison et al.* v. *Barrett* (16 Iowa, 278), and *Thomas* v. *Hillhouse* (17 id. 67), must be affirmed. At the time of the levy of the writ of attachment, the defendant therein, Joseph Walden, was not the owner of the warrant, and, by the levy, the attaching creditor only acquired the interest of his debtor therein. Drake on Attachment, § 223. What would have been the effect, upon the rights of the parties, of a sale under the attachment proceedings before any claim to, or notice by, Bradley & Campbell, of their interest in the warrant, we need not determine. They have been diligent in the assertion of their rights, and made their claim before the plaintiff had advanced any consideration or changed his position by reason of the seizure of the warrant under his attachment. Their rights accrued prior to the plaintiff's and are paramount to his.

<div align="right">Affirmed.</div>

## THE STATE v. MUNZENMAIER.[*]

1. **Grand jury:** IRREGULARITY IN RECORD: BYSTANDERS. Where the record shows that the sheriff brought "into court fifteen good and lawful men to serve as grand jurors," eight of whom were different persons from those named in the precept, it is not error to overrule a motion, based on this condition of the record, to set aside an indictment found by such grand jury, when it appears that those returned not named in the precept were selected from the bystanders upon the failure of that number named in the precept to appear.

2. —— RECORD: NUNC PRO TUNC ORDER. And in such case a *nunc pro tunc* order may be made at a term subsequent to that at which the indictment was found, showing that the panel was thus filled.

3. **Intoxicating liquor:** EVIDENCE: INDICTMENT. Proof of the sale of intoxicating liquor at the place and within the time named is presumptive evidence of the commission of the offense in an indictment for nuisance, under the eighth section of the act for the suppression of intemperance (Rev. § 1564), which charges that defendant not only *kept* intoxicating liquor *with intent to sell*, but *sold* the same.

4. —— EVIDENCE. On the trial under an indictment based on said section, a witness stated that what he knew about the location of the building named in the indictment, he obtained from the record, but also testified, that, from his examination of the city plat, and his familiarity with the lots and blocks in the neighborhood of defendant's saloon, he was able to fix it upon the lot described. It was urged in an instruction offered by defendant, that, under these circumstances, the record was the best evidence and should have been produced. *Held*, first, that the record was not the best evidence. Second, that if it were, the question could not be raised for the first time in the instructions.

5. —— NUISANCE: AMOUNT OF FINE. In an indictment for nuisance under said section (1564 of the Revision) it is not necessary to show that defendant has been previously convicted, to justify a fine exceeding twenty dollars. Section 1562 of the Revision does not apply to a prosecution of this kind.

6. **Criminal law:** JUDGMENT BY AGREEMENT. The fact that there were several indictments pending in the court below against other defendants for a similar offense, and that, after a verdict of guilty was rendered in the case at bar, an agreement that the same entry should be made in the other cases, and the case at bar be appealed, and all the others abide the decision in it, does not invalidate the

conviction in the case actually tried.   Whether the convictions entered in the other cases, pursuant to the agreement, would be valid, *quere*.

### *Appeal from Polk District Court.*

### WEDNESDAY, JANUARY 29.

DEFENDANT was indicted under the eighth section of "the act for the suppression of intemperance."   At the July Term, 1866, of the Polk District Court, he was tried and convicted — fined $200, and now appeals.   For further facts see the opinion.

*J. M. Ellwood* with *Finch, Clark & Rice*, for the appellants.

*Henry O'Connor*, Attorney-General, for the State.

WRIGHT, J.—I. It appears that this indictment was found in January, 1866.   In November, 1865, the clerk issued his precept to the sheriff, commanding him to summon fifteen persons by name to serve as a grand jury for the year commencing the then next January.   At the January Term, when this indictment was found, the record shows that the sheriff brought into court "fifteen good and lawful men to serve as grand jurors," eight of them being other and different persons from those named in the precept.   Defendant moved to set aside the indictment, because the grand jury were not selected or summoned as required by law; because the sheriff had no precept, and because the sheriff returned other persons than those named in the precept.   This motion, upon the evidence above stated, was overruled.   In deciding it, however, the judge stated that he had a recollection, that, at the said January Term, several of the jurors drawn and summoned did not appear, and that their places were filled by the sheriff from the

*1. GRAND JURY: irregularity in record: bystanders.*

bystanders, and the court thereupon upon its own motion and knowledge of the facts directed the clerk to make a *nunc pro tunc* order, showing in substance that eight of the persons named in the sheriff's precept failed to appear though called, and that the panel was filled by the sheriff by those named in the former order in connection with those who answered to their names. In this condition of the record it is objected that the court erred in over-ruling the motion to set aside the indictment upon the evidence offered before the entry of the *nunc pro tunc* order; that it was error to make that entry, and that with it the ruling was still erroneous.

What is meant by the objection that the sheriff had no precept, we do not understand. He had a precept fully complying with section 2733 of the Revision, and this very precept the defendant offered in evidence in support of his motion. The suggestion, in argument, that the sheriff failed to make any return of his doings under the process, is equally without force. The return itself was not called for, its sufficiency as such was not in issue, and if conceded it would make no difference. For, after all, the question is, whether there was such a departure from the law in the selection of the grand jury, as to justify the court in setting aside this indictment.

It is needless to inquire whether, without the aid of the corrected record, this motion should have been sustained. For, if properly made, it is but the entry, of record, of the facts as they existed at the time the motion was decided, and for the purpose of the present inquiry it must be treated as though then made. And if properly made the question is of easy disposition.

The objection to it is, that it was made at a subsequent term, and that this could only be done to correct an evi-

2. —— record: dent mistake (Rev. 2667). We do not, how-
*nunc pro tunc*
order.    ever, understand that this order alters or

changes a prior one. It surely is not in conflict with it, but rather explains it. The sheriff, it will be remembered, brought into court fifteen men. But how? Not necessarily upon his precept. Not only so, but we cannot say, all the facts being before the court, but that the mistake, if one, was evident; just such as the law contemplates may be amended or altered. Without the correction we think the motion was properly overruled. With it, there is no semblance of error.

II. The instructions given and objected to are, for the most part, identical with those passed upon in *The State*

3. INTOXICAT-
ING LIQUOR:
evidence:
indictment.

v. *Baughman* (20 Iowa, 497); *Same* v. *Guisenhause* (id. 228); *Same* v. *Carny* (id. 82). In addition to what is said in those cases, we remark that the indictment charges that defendant not only *kept* intoxicating liquors *with intent to sell*, but *sold* the same, at the place named. An instruction, therefore, that proof of the sale at the place and within the time named is presumptive evidence of the commission of the offense charged, is in the exact language of the statute. Whether proof of the *sale* would be presumptive evidence of the *intent to sell*, we need not inquire. And that this is the correct view of the record is further shown by defendant's first instruction which was given, and which charged that there could be no conviction "without proof of the *sale* or keeping *with intent to sell*."

A witness, without objection, stated, that, what he knew about the location of the building named in the indict-

4. ——
evidence:
instructions.

ment, he obtained from the record, and yet testified, that, from an examination of the city plat, and his familiarity with the location of lots and blocks in the neighborhood of defendant's saloon, he was able to fix it upon the lot described. An instruction under such circumstances, that the record was the best evidence, and should be produced, otherwise defendant

must be acquitted, was very properly refused. It is not the best evidence in the first place, and if it was, the question could not be made for the first time in the instruction.

III. Defendant was fined two hundred dollars. It is now objected that there was no evidence, that this was a third

5. —— nuisance: amount of fine. or other than a first conviction, and that therefore, under the law, the fine could not exceed twenty dollars. The indictment, however, is under section eight, and not section six of the act, and in it there is nothing said about a first, second or third conviction. Offenders thereunder are guilty of a nuisance, and may be prosecuted and punished, in the manner provided by law.

IV. It seems that there were eight other cases pending in the District Court, against other defendants for a similar

6. CRIMINAL LAW: judgment by agreement. offense. This and one other were tried — verdicts of guilty returned, and then it was agreed that the same entries should be made in the others; that this case should be appealed, and all the others abide the decree in this. Counsel now suggest, upon the authority of *Cancemi* v. *The People* (18 N. Y. 128), that the judgments thus entered by agreement, without trial or conviction, are utterly void, and asks us to so decide. The only case before us, however, is that against the one defendant Munzenmaier, who was regularly tried and convicted. What course may be taken with the other judgments, in view of the objection above suggested, we have no means of knowing. It is sufficient to decide the case before us, and it will be time enough to dispose of the others when properly appealed, if in fact any thing shall remain for determination, in view of the agreement and the order now made that this judgment stand

Affirmed.

THORNBURG v. BROMFIELD AND BROMFIELD; Executors.*

Contract: VERBAL FOR SALE OF LAND: EQUITY. To justify a court of
equity in ordering the specific performance of a verbal contract for
the sale of real estate, such contract should be clearly established
by the evidence. The facts which were, in the present case, held
insufficient to establish a contract of this character, stated and dis-
cussed by COLE, J.

*Appeal from Dallas District Court.*

WEDNESDAY, JANUARY 29.

STROTHER BROMFIELD and Jesse Bromfield, Jr., as execu-
tors of the last will of Jesse Bromfield, Sen., deceased,
late of Randolph county, Indiana, brought their action by
ordinary proceedings against Levi Thornburg, in the Dis-
trict Court of Dallas county, for the recovery of the pos-
session of 320 acres of land in sections one and two of
townships eighty-one, range twenty-eight, in said county.
The defendant therein, Levi Thornburg, filed his answer,
setting up an affirmative equitable defense.

Afterward, Levi Thornburg brought his action by
equitable proceedings, in the same court, against Strother
Bromfield and Jesse Bromfield, Jr., as executors of the
last will of Jesse Bromfield, Sen., deceased. The cause
of action was the same as that upon which the equitable
defense was based, but it was stated in the petition with
greater particularity and more in detail. The said Thorn-
burg, by his equitable action, seeks a specific performance
of an alleged parol contract for the sale and purchase of
the identical land for the recovery of the possession of
which the Bromfield executors brought their ordinary
action. The plaintiff, Thornburg, claims, that, in April,
1864, he made a parol contract with the defendant
Strother Bromfield, as executor, etc., for the purchase of
the land in controversy ; that, at the time of the making

of the contract, all the parties resided in Randolph county, Indiana, where the contract was made; that, after their first interview, Thornburg came to Iowa and looked at the land; that, upon his return, the contract was concluded, whereby Thornburg was to have the land for whatever three disinterested men living in its vicinity and selected by the parties would appraise it at; one-third the purchase price was to be paid down, and one-third each in nine and eighteen months; if the land should be appraised at five dollars per acre or less, Thornburg was to pay five dollars, but if appraised at five dollars or more, he was to pay the appraisement price; that Thornburg left and came to Iowa, and took possession of the lands in four days after the contract, and under and pursuant to it; the deed was to be handed in three or four weeks to a relative of his, who was to hand over the money and notes.

On motion of Thornburg, the ordinary action by the executors against him was transferred to the equity docket, and consolidated with his equitable action against the executors. The causes were tried together, and the District Court found for the plaintiff Thornburg; decreed specific performance of the parol contract, and rendered judgment for him in the ordinary action for the possession. The executors appeal.

*Williamson & St. John* for the appellants.

*C. C. Nourse* and *J. R. Reed* for the appellee.

Cole, J. — The respective counsel, in their oral arguments, discussed, with learning and ability, certain legal questions involved in the different hypotheses of fact disclosed by the testimony; such as the power of the executors, under the language of the will, to sell and convey the real estate in controversy; the authority of one exec-

utor, both having qualified and being still alive, to make the alleged contract, the other executor manifesting a purpose to take no part in the disposition of this particular and other real estate situated in Iowa, etc.

But preliminary to these legal questions, is the one of *fact*, whether there is established by the evidence, a con-

CONTRACT: tract for the sale and purchase of the land in
verbal for sale
of land : equity. controversy. We are agreed in the opinion (not without some hesitation and doubt on the part of the writer) that the plaintiff has failed to establish the alleged contract by such evidence as will justify a court of equity in specifically enforcing it. We need state only a few of the leading thoughts resulting in this conclusion. The fact that there was a contract of sale is testified to only by the plaintiff and one witness, and they differ as to its terms; one testifying that the payments were to be in cash, one-third down, and one-third each in nine, and eighteen months; and the other, that the land was to be paid for at once upon delivery of deed, one-third in cash, and the other two-thirds in promissory notes, executed to, and held by, plaintiff upon third parties.

Against this, we have the testimony of the defendant Strother Bromfield, with whom the alleged contract is claimed to have been made, that he never did make any contract for the sale of the land to plaintiff.

We have also the testimony of two other witnesses who were present at the time the plaintiff and his witness testify the contract was made, and they both testify in direct and positive terms that no such contract was made. A critical analysis of all the evidence, however, discovers a doubt as to whether the defendant's witnesses testify of the same conversation in which the plaintiff claims the contract was made; but the defendant and his witnesses verify it to be the same. If it be the same, then it is very clear that the weight of evidence is, that

no such contract was made ; if it be another conversation, however, still it leaves the plaintiff without that clearness and certainty of evidence requisite to entitle a party to a specific performance. Especially is this so, when it is remembered that there is no single fact established in the case, inconsistent with the defendant's claim, to wit, that there was only a negotiation for, and not a contract of sale of the land. A few of the established or conceded facts will show with reasonable certainty the correctness of our conclusion.

No definite price for the land was agreed upon. No steps were ever taken toward the selection of appraisers to fix the price. No part of the consideration was ever paid or tendered, although the suit at law for the recovery of the possession was not brought until two years after the alleged contract. Neither party supposed that the executors had the power to make a valid contract of sale of the land, until an order of court therefor was duly made ; and in the conversations it was distinctly understood by both parties, after consulting counsel, that application was to be made to the proper court for an order of sale. As soon as defendants knew that plaintiff had taken possession of the land they objected thereto, and within two months notified him to leave the same. Although the plaintiff claims that the deed was to be made, and the third of the consideration paid within three or four weeks after the verbal contract was made, no demand for the deed, or offer to pay, was made until after suit brought for the recovery of the property. The only fact relied upon to take the contract out of the statute of frauds is, that possession was taken by the purchaser. The defendants and their witnesses deny positively that any leave to take possession was ever given to plaintiff; and plaintiff's possession is as easily attributed to his own wrong, as to any right under a

verbal contract; and that defendants objected thereto as soon as they had knowledge of it, and within about two months from his entering thereon, is proved by the plaintiff himself.

Without pursuing the subject further, we may say, that against our first impressions, as received upon argument, and after a careful reading and rereading of the entire transcript and evidence (about three hundred and fifty pages) we are brought to the conclusion that plaintiff has failed to so sufficiently and clearly establish a verbal contract for the sale of the land as will justify a court of equity in ordering a specific performance of it.

The judgment of the District Court will, therefore, be reversed and the cause remanded; and the equitable action brought by Thornburg against Strother Bromfield and Jesse Bromfield, Jr., Executors, etc., will be dismissed absolutely at plaintiff's costs. The ordinary action by Strother and Jesse Broomfield, Executors, etc., against Thornburg, will be retransferred to the ordinary docket and set down for trial upon the issues made other than the equitable one.

<div align="right">Reversed.</div>

---

### ADAMS v. BOIES & BARRETT.

Principal and agent: LIMITATION OF AUTHORITY: PURCHASES ON CREDIT. Where an agent is furnished with money to pay for property which he is authorized to purchase, there is no such limitation on his authority to buy on credit, as to require him to pay the instant or on the same day for property which he purchases without any understanding or agreement that credit is to be given therefor.

*Appeal from the Louisa District Court.*

WEDNESDAY, JANUARY 29.

PRINCIPAL AND AGENT: AUTHORITY OF AGENT, ETC. — Plaintiff sues for the value of two lots of hogs, sold and

delivered in October, 1866, to one Walker, as the agent of the defendants.

That plaintiff delivered the hogs to Walker, is not denied. There is no contest as to the value of the hogs. There is no question made as to the fact, that Walker (a resident of Muscatine) acted in that place and throughout the adjacent country as the agent of the defendants (grain and cattle dealers, residing in Washington, Iowa), in making purchases and shipments of stock for them. Defendants furnished Walker with money to pay for his purchases, and particularly made arrangements with a bank in Muscatine to cash checks drawn upon it by Walker. Walker had acted as the agent of the defendants some eight or ten months, making purchases of stock for them. During that period he had bought hogs of the plaintiff at six different times. When he wished to buy in order to fill up a car he would come in person or send a wagon to the plaintiff, get hogs and then, or very soon afterward, settle for them. He acted as agent for no other person, and there was no testimony in the case showing that he bought stock on his own account. The two lots for which this action is brought were sold in the same way that the others had been. On the first of these two lots Walker paid $125. In three or four days after the delivery of the second lot, the plaintiff went to Muscatine and asked Walker for his pay, but did not get it. Shortly after that Walker ran away.

Under the instructions of the court, the jury returned a verdict for the plaintiff.

Judgment was rendered accordingly, and defendants appeal.

*J. Tracy* for the appellants (defendants).

*Henry O'Connor* for the appellee.

DILLON, Ch. J. — The evidence is all in the record. In our opinion it warranted the verdict in favor of the plaintiff. Defendants contended, that Walker's authority was limited, and that he was expressly required or instructed to pay for stock *at the time* it was purchased or received. But there is no proof showing or tending to show, that the plaintiff had knowledge of these instructions.

*PRINCIPAL AND AGENT: limitation of authority: purchases on credit.*

Defendants asked the court to instruct the jury that if Walker was provided with money to pay for hogs, he would have no authority to buy *on credit*, and defendants would not be liable to the plaintiff for the value of hogs so purchased, unless he (plaintiff) could show that Walker was authorized by the defendants to buy on credit. The court refused thus to instruct, but charged, that, if Walker had been acting as the agent of the defendants, in Muscatine county, for some months, and during that time purchased the hogs in question of the plaintiff, the latter expecting to be paid for them when he should call for the money in Muscatine, the defendants were liable.

Defendants excepted to the refusal to give their instructions, and to the giving of the one the substance of which has just been stated.

Defendants' instructions were properly refused, for there was no evidence that plaintiff did sell the hogs in question *on credit*. On the contrary, the evidence showed that the sales were made without any agreement, stipulation or understanding that credit was to be given. There was no such limitation on Walker's authority shown as to require him to pay the instant or on the same day he received the property.

The transaction of the plaintiff with Walker, in making the sales of the hogs sued for, was precisely the same as previous transactions with him, in relation to which no question was ever made. The instructions of

the court, in view of the apparent powers of Walker, and the want of any knowledge on the part of the plaintiff of the special limitations on Walker's authority, now insisted on by the defendants, were correct.

If the instruction missupposed the fact that the delivery of the second lot of hogs was to a wagon sent for them by Walker, instead of to Walker in person, this mistake is not sufficient to reverse a judgment which the undisputed facts of the case show to be both legal and just.

Affirmed.

MORDHURST v. BOIES & BARRETT.

Principal and agent: POWER TO BORROW MONEY. An authority to an agent, from his principal, to draw checks on a bank in payment of property purchased by the agent, would not alone authorize the inference that he was authorized to borrow money on the responsibility of his principal.

*Appeal from Louisa District Court.*

WEDNESDAY, JANUARY 29.

PRINCIPAL AND AGENT: EXTENT OF AGENT'S AUTHORITY: POWER TO BORROW MONEY. — Action for money alleged to have been *loaned* by plaintiff to defendants. Answer — in denial.

The evidence showed that the plaintiff loaned $300 to Walker, who is claimed to be the agent of the defendants. The general nature of Walker's agency appears in the statement of the case of *Adams* v. *Boies & Barrett, ante.* He was defendants' agent to buy and ship cattle. The money sued for was borrowed by Walker, about the 1st of November, 1866.

Plaintiff testified as follows: "Walker came into my shop after banking hours and wanted $300, and another man from Illinois came in and prevented a check being given; I have not seen Walker since."

*Cross-examined:* "Walker had then two car loads of stock; don't know how many he shipped; don't know who the *two car loads were for;* did not say particularly who he wanted *the money for;* he offered me a check; he had not written it yet; said he would give me a check, but did not hand it to me; I was around with Walker the day before, buying hogs."

Defendant Barrett testified: "That Walker had no authority to borrow money for the defendants; but had previously been authorized to buy and ship cattle; that *October* 10*th to* 15*th,* 1866, they settled with Walker, and requested him to buy no more stock for them except to fill out a car load then on hand, which he did, and defendants arranged with the bank to pay for, and did pay for it."

It appeared that Walker ran away about the first day of November, 1866. There was some other evidence in the case tending to prove Walker's agency, but, as that was not disputed, it is not essential to refer to it more at length.

The court refused certain instructions prayed by plaintiff. It gave certain instructions of its own. Plaintiff complains of both. Defendants had a verdict. Plaintiff appeals.

*Henry O'Connor* for the plaintiff (appellant).

*J. Tracy* for the appellees.

"1. An agent has no right to borrow money on the

responsibility of his principal, unless he is authorized by PRINCIPAL AND his principal to do so, or unless authority to AGENT: power to borrow do so can be justly inferred from the acts of money. the principal in connection with the business of the agency.

